PAUL TRIMMIER, CANVASSING BOARD, ET AL. V. J. B. CARLTON ET AL.

No. 4226.   Decided June 4, 1927.

(296 S. W., 1070).

1.—Statutes—Adoption by Specific Reference—Subsequent Amendment.

The general rule is that when an existing statute is adopted by a specific descriptive reference as part of a later enactment the adoption takes the statute as it exists at that time, and subsequent amendments thereof would not be within the terms of the adopting Act (Fischer v. Simon, 95 Texas, 234, 239). But when the language of the adopting Act is such as to evidence an intention that the Act as it then existed and as it might thereafter be amended was to be adopted the courts will give effect to that intention. (P. 579).

**2—Corporations—Creation and Organization—Adoption of Existing Former Statute—Amendments.**

The law governing certain corporations authorized by an Act of the Legislature being specifically designated as that governing other corporations authorized by a previous statute, a subsequent amendment adding to such designation of the governing statute the words "and amendments," at a time when no amendments had been made thereto, could refer only to future amendments. By this, amendments thereafter made to the statute so designated and adopted became a part of the law governing the creation of the corporation under the Act, adopting such previous statute before so amended. (Pp. 579, 581).

**3.—Same—Conservation and Reclamation Districts.**

The amendment of the Act (Water Improvement Districts) adopted as the law governing irrigation (conservation and reclamation) districts and providing for the issuance of preliminary organization notes instead of bonds, applied to districts embracing land in several counties, as well as to one-county districts. (P. 581).

**4.—Conservation and Reclamation Districts—Creation and Organization.**

Reviewing the legislation governing the creation of conservation and reclamation districts, and also that respecting water improvement, drainage and levee improvement districts and the various amendments thereto, it is held that the creation and organization, under the law in force in July, 1923, of an irrigation district (conservation and reclamation under the Canales Act of 1918, Laws, 35th Leg., 4th Called Session, ch. 25, p. 40) embracing land in three counties was governed by the statutes relating to the latter named districts (water improvement, drainage and levee improvement) as amended up to that time, not by that existing and adopted by the "Canales" Act at the time of its enactment. That is, the approval of the enterprise as practicable and advisable, the designation of the district boundaries, and the directing of an election by resident owners of real estate for its creation, was under the authority of the Board of Water Engineers, not as held by the Court of Civil Appeals herein (264 S. W., 253) to be done by the commissioners courts of the several counties. Also, by such amendments, a majority instead of a two-thirds vote of resident real estate owners was sufficient for its adoption, and the directors thereby chosen were authorized, by a favorable vote thereon, to issue preliminary organization notes, instead of bonds, to meet the expenses of organizing the district. (Pp. 578-584).

**5.—Same—Case Distinguished.**

The decision in Fischer v. Simon, 95 Texas, 234, 239, announces a mere rule of statutory construction for the purpose of determining the intent of the Legislature which is not to be followed where it leads to absurdity or confusion and thwarts the plain purpose of the Legislature. (P. 580).

**6.—Constitution—District Indebtedness—Preliminary Notes.**

Article 16, Sec. 59, subd. c, of the Constitution is broad enough to authorize the submission of the right of directors of an irrigation corporation to issue preliminary organization notes, and the district created by the election was not limited in the creation of an indebtedness to the issuance of bonds. The issuance of such notes could be submitted to the voters at the same time and election as that of the creation of the district. Unless an Act is clearly unconstitutional it should be held valid. (Pp. 583, 584).

7.—Irrigation District—Preliminary Organization Notes—Election to Authorize.

The submission to the voters of a proposed district of authority to the directors elected therein to issue preliminary organization notes of the district need not describe the notes to be authorized nor specify the rate of interest. The statute does not so require, but, subject to the statutory limitation as to amount, left these matters to the judgment of the directors. (P. 584).

8.—Board of Water Engineers—Necessity of District and Lands to Be Included.

By the statutes here considered the Legislature authorized the Board of Water Engineers, upon hearing of an application to create an irrigation district, to determine the public aspects of its creation, whether the lands embraced would be benefitted, to exclude therefrom lands which would not be benefitted, and to include, on notice to and hearing of parties interested, other lands which would be benefitted but which were not included in the application. (Pp. 584-586).

9.—Constitutional Law—Departments of Government—Exercise and Delegation of Legislative Powers.

The Legislature, in enacting a statute whereby a certain territory may by vote of its inhabitants through initiative and referendum become a municipal corporation with the right, for the purpose for which it was made such, to contract debts and impose burdens of taxation on owners of property therein, is not making such a delegation to them of the legislative power to create a corporation as is forbidden by the Constitution (Art. 1, Sec. 9; Art. 5, Sec. 1). Stanfield v. State, 83 Texas, 317; Werner v. Galveston, 72 Texas, 22; Kinney v. Zimpleman, 36 Texas, 554; Fallbrook Irrig.·Dist. v. Bradley, 164 U. S., 112, followed. (Pp. 589-597).

10.—Same.

The apparently all inclusive language of the Constitution prohibiting the exercise of legislative power except by the Legislature does not include delegation of power to the people to organize public corporations for the administration of local affairs, nor the granting to some designated body powers which the Legislature cannot itself practically and efficiently exercise. The prohibition is to be construed in the light of the common law and of the historic practice in America and England in legislating on the subject of municipal corporations. (Pp. 595, 596).

11.—Vote for Creating District—Excluding Municipal Corporation Voting Adversely.

The vote of a municipal corporation included within the limits of a proposed irrigation district against the creation of such district was properly excluded from the determination of the result in the entire district in accordance with the statute so declaring and excluding the city so adversely voting from the boundaries of the district. (Vernon Rev. Civ. Stats., 1922, Art. 5107-118.) (P. 597).

12.—Practice in Supreme Court—Findings of Trial Court—Designating Boundaries of Irrigation District.

The trial court having found the designation of the boundaries of a proposed irrigation district by the Board of Water Engineers, under which they directed the question of the creation of such district to be submitted

to the voters therein, to be too indefinite and not to enclose a definite area, and there being evidence to sustain such finding, the Supreme Court, though marking their dissent from the trial court and from the Court of Civil Appeals as to the various grounds on which such district was held not to have been lawfully created, and such ruling sustained on appeal, in deference to such finding of fact, which it has no jurisdiction to review, here affirms their judgment. (Pp. 597-602).

Error to the Court of Civil Appeals for the Third District in an appeal from Runnels County.

In an action by Carlton and others against Trimmier and others the irrigation district here involved was held not to have been lawfully created, and the defendants were enjoined from proceeding to organize it and operate under it. On their appeal the judgment was affirmed (264 S. W., 253) and they obtained writ of error.

*A. K. Doss* and *Gaines, Quin, Harley & Gaines,* for plaintiff in error.

*W. P. Dumas,* as *amicus curiae,* by leave of the court, filed brief on the subject of delegation of legislative power, supporting the position of plaintiffs in error.

*Carden, Starling, Carden, Hemphill & Taylor, O. L. Parrish,* and *W. M. Taylor,* for defendants in error.

MR. CHIEF JUSTICE CURETON delivered the opinion of the court.

This case originated as an election contest, over which the Supreme Court ordinarily would not have jurisdiction. In the course of its progress, however, its form was changed, the election contest feature being eliminated. The opinion of the Court of Civil Appeals contains a fair resume of the case, and we deem a complete statement in this opinion unnecessary. See opinion of the Court of Civil Appeals, Trimmier v. Carlton, 264 S. W., 253.

On July 9, 1923, J. L. Scott and 292 others filed with the Board of Water Engineers a petition for the creation of a Conservation and Reclamation District out of territory lying in Coke, Runnels, and Tom Green Counties, under the Conservation Amendment to the Constitution, Article 16, Section 59, and by authority of Chapter 87, Acts of the 35th Legislature, and amendments and additions thereto.

The general method of irrigation contemplated, as shown by the petition to the Board, was the construction of a dam across the Colorado River near the town of Bronte, in Coke County, and conducting the water thus impounded by gravity in the

usual way to and over the lands to be irrigated. The purposes of the District were the irrigation of the lands therein and those which might be added thereto, to furnish water for domestic and commercial purposes, to sell any surplus it might have for the irrigation of lands not situated in the District, to co-operate with the Federal Reclamation Service for irrigation purposes. Generally, the petition stated that the District was to have "full power and authority to do and perform all acts authorized by Chapter 67 (87) of the Acts of the 35th Legislature of the State of Texas, and any and all amendments or additions thereto, whether heretofore or hereafter to be made."

The method of irrigation contemplated and the objects thus defined were all within the statutes, if these statutes are applicable and valid. Vernon's Sayles' Civil Stats. (1922 Supp.) Arts. 5107-1, 5107-24, 5107-108, 5107-118, 5107-122L, 5107-122n; (1918 Sup.) Arts. 5107-20, 5107-21, 5107-83, 5107-109, 5107-110; Acts 38th Legislature (1923) C. S., Chap. 11; Vernon's Complete Texas Stats., Arts. 5107-267 to 5107-276.

The land embraced in the proposed District was approximately 175,000 acres, and the estimated cost of the improvements necessary to irrigate it was $5,000,000.

In response to the prayer of the petition, after the issuance and service of the statutory notice a hearing was had by the Board of Water Engineers, at which parties appeared for and against the creation of the District, and offered evidence in support of their respective contentions. Upon this hearing the Board changed the boundaries of the District as originally proposed, so as to eliminate therefrom about 16,000 acres of land, and to add thereto approximately 1,000 acres not previously included. Whether or not this addition was made after notice to the owners thereof, other than the statutory notice of hearing, the record does not disclose, but no question is raised as to that. Such notice and hearing, unless waived, are essential to due process, and the statute in authorizing the inclusion of additional lands no doubt contemplates a notice to the owners thereof and an opportunity to be heard at some stage of the proceedings. Ross v. Board of Supervisors, 1 L. R. A. (N. S.) 431; Browning v. Hooper, 269 U. S., 396.

The Board after modifying the boundaries as stated, found "that the organization of such District and the construction of the proposed irrigation system is *feasible and practicable and that it is needed and would be a public benefit to the land included in the District and would present a public utility,*" and

entered the necessary order directing that an election be held to create the district.

Pursuant to this order, and within the terms of the statute, the election was ordered and held in each of the counties in which was located a portion of the lands to be embraced in the District.

Returns showed that a majority of all votes cast in the entire District was against its creation and the issuance of preliminary or organization notes. There were three incorporated towns in the District, however: Ballinger, Bronte, and Miles. The returns from Ballinger showed a large majority against the organization of the District and issuance of the notes, while the returns from Bronte and Miles showed majorities in favor of each proposition. By eliminating Ballinger only from the District, a majority favored the creation of the District and the issuance of the notes. By eliminating all of said incorporated towns, the creation of the District and the issuance of the notes lost. Inasmuch, however, as by eliminating Ballinger a majority of the votes in the proposed District was in favor of the propositions submitted, the District was declared created, and its directors qualified as such. Before the injunction was served on the officers of the District, they made and entered an order authorizing the issuance of the organization notes voted in the sum of $75,000 and purported to enter into a contract with one Hillenmayer to sell them for this amount. At this stage of the proceeding an injunction was served, and the activities of the District and its directors stopped.

The suit, in the course of which the temporary injunction was issued, was filed by the defendants in error, or some of them. Final trial was before the court without a jury, and judgment rendered against the plaintiffs in error, the effect of which was to invalidate the creation of the district and enjoin any further action by it. The trial court filed conclusions of fact and law consistent with this decree. Upon appeal to the Court of Civil Appeals by plaintiffs in error, this judgment was affirmed, and the case is now before us by writ of error granted at a previous term.

The conclusions of law of the trial court, stated generally, were that the entire organization of the District, beginning with the petition and ending with the activities enjoined in this action, was null and void, because the statutes followed were not applicable, and because certain of the statutes were unconstitutional.

OPINION.

The trial court held the organization of the District void, for the reason that such a District could only be organized under the Water Improvement Law as it existed at the time of the passage of the Canales Act in 1918.

The Canales Act, the authority for the organization of Conservation and Reclamation Districts, adopted the Water Improvement Act, Chap. 87, Acts 35th Legislature, as the law of the organization and government of such Districts. The Water Improvement Act was afterwards amended in material respects, and as amended was followed in the organization of the District before us. The amendments, so far as here involved, were in substance as follows:

(a) Under the Act of 1917 as it existed when adopted by the Canales Act in 1918, the vote necessary to establish a Water Improvement District was a *two-thirds vote*. Vernon's Sayles' Texas Civil Statutes, 1918, Supplement, Arts. 5107-9, 5107-80, These provisions were amended in 1919 so that the vote thereafter required was a *majority vote*. Vernon's Sayles' Texas Civil Stats., 1922 Supplement, Arts. 5107-9, 5107-80, Acts 1919, 2 Called Session, Chap. 28, Sec. 80.

(b) Under the law of 1917 as originally adopted by the Canales Act districts in more than one county could be organized only through the commissioners' courts of the several counties. See statutes above cited. These statutes were, however, amended in 1921, making the Board of Water Engineers the initial agency for the organization of districts of this character. Vernon's Texas Civil Stats., 1922 Sup., Arts. 5107-80.

(c) At the time of the original adoption of the above named law by the Canales Bill, no authority existed for submitting to the voters of the proposed district the question as to whether or not preliminary or organization notes should be issued. Vernon's Sayles' Texas Civil Stats., 1918 Sup., Arts. 5107-5, 5107-7, 5107-9. These sections of the law were, however, amended in 1923, and such notes provided for. Acts 38th Legislature, 2d Called Session, Chap. 11.

All of these amendments were in effect when the attempt was made to organize the district here involved, and were followed in the organization.

Without mentioning at this point other conclusions of the trial court, the primary question for immediate discussion is whether or not these amendments were applicable to the organization of Reclamation and Conservation Districts. The trial court and the Court of Civil Appeals found that they were not applicable.

These conclusions were predicted upon the proposition that Conservation and Reclamation Districts could only be organized under the Water Improvement Act as it existed in 1918, when the Canales Act was passed. In other words, the Canales Act adopted the *Act of 1917 as it existed in 1918,* and no amendment subsequent to that time of the Water Improvement Act was effective in so far as Conservation and Reclamation Districts are concerned. With this construction we cannot agree. It is true that Sec. 6 of Chap. 25, Acts of 1918, as originally enacted, declared that Conservation and Reclamation Districts organized for the purpose for which water improvement districts and irrigation districts had theretofore been organized "shall be governed and controlled by the provisions of Chap. 87, Acts of the 35th Legislature." But in 1919, at the Second Called Session of the Legislature, this Section was amended, and to the provision that Conservation and Reclamation Districts should be governed by Chap. 87 of the 35th Legislature was added, *"and amendments thereto."* This subsequent amendment is a clear-cut adoption of Chap. 87, Acts of the 35th Legislature, *together with amendments thereof,* except of course as otherwise provided in the Act. Vernon's Complete Texas Stats. (1920), Art. 5107-272, Acts 36th Leg. (1919) 2nd C. S., Chap. 12.

Statutes which refer to other statutes and make them applicable to the subject of legislation are called "reference statutes," and are a familiar and valid mode of legislation. The general rule is that when a statute is adopted by a specific descriptive reference, the adoption takes the statute as it exists at that time, and the subsequent amendment thereof would not be within the terms of the adopting Act. But when the language of the adopting Act is such as to evidence an intention on the part of the Legislature that the Act as it then existed and as it might thereafter be amended was to be adopted, then the courts will give effect to that intention, and the adopted Act and amendments thereto will be held to be within the meaning of the adopting Act and to govern the subject matter thereof. 25 Ruling case Law, pp. 907, 908, Sec. 160; State v. Leich, 9 Anno. Cases, 302, and Notes page 301; Anno. Cases 1916B, page 372, and Notes page 375; State v. Superior Court, 126 Pac., 920; Jones v. Dexter, 8 Fla., 276; Hay v. Baraboo, 3 L. R. A. (N. S.), 84; In Re Guenpheores Estate, 83 Atl., 617, 618; Culver v. People, 43 N. E., 812, 814; Dudley Gas Works Co. v. Warmington, 29 Weekly Reporter (Q. B. Div.), 680. A consideration of these and other authorities will show that the Legislature plainly had the power to adopt Chapter 87, Acts of the 35th Legislature

"and amendments thereto," including future amendments. At the time of the passage of the Act amendatory of the original Canales Bill, which was on July 15th by the House and July 17, 1919, by the Senate, Chapter 87, the adopted Act, had never been amended. The reference therefore was unmistakably to amendments to be thereafter enacted, and necessarily embraced those here involved.

The Court of Civil Appeals predicates its opinion largely on the use of the word *"now"* used in the first section of the Canales Act, and by applying thereto the rule announced in Fischer v. Simon, 95 Texas, 234, 239.

The rule announced in Fischer v. Simon, supra, is ·a rule of construction, its application is for the purpose of ascertaining the intent of the Legislature, and it ought not be applied when this will lead to an absurdity or thwart the plain purpose of the Legislature. 25 R. C. L., p. 1019, Sec. 257, p. 960, Sec. 216; Eppstein v. State, 138 S. W., 1124; Davis v. Payne, 179 S. W., 60; City of Corpus Christi v. Mireur, 214 S. W., 528. Its application in the present case would lead to just such a result. In fact, the Court of Civil Appeals, although applying the rule in this case, said:

"We may concede that this construction of the several statutes results in a rather anomalous situation and throws the law in regard to the creation of conservation and reclamation districts into some degree of confusion."

We ought not to give any legislative Act a construction which will throw the law "into some degree of confusion," if it can be ascertained that the Legislature had fairly expressed any other purpose. 25 R. C. L., p. 1018, Sec. 256. The mere use of the word *"now,"* though a word ordinarily of the present tense, is not a controlling factor. Revised Stats. 1925, Art. 10; 25 R. C. L., p. 964, Sec, 219; Runnels v. Belden, 51 Texas, 48; State v. Superior Court, 126 Pac., 920; Atkinson v. Swords, 74 S. E., 1093.

The language employed in the first section of the original Canales Act, to the effect that Conservation and Reclamation Districts could be created and organized in any manner that Water Improvement Districts "are now authorized by the laws of the State to be created," was not one of the exceptions to the general adoption of Chap. 87, Acts of the 35th Legislature, provided for in Section 6, the adopting section. The exceptions to the full and complete adoption of Chap. 87 by Sec. 6 clearly had reference to Sec. 3 and 4 of the original Act, which read together removed the limitations of indebtedness which might

be incurred under Sec. 52, Art. 3 of the Constitution, and which were carried into the Water Improvement Act by Chap. 87, Acts of 1917. See Chap. 87, Sec. 56, Vernon's Sayles' Civ. Stats., 1918 Supp., Art. 5107-57.

There is nothing in the amended Canales Act to evidence an intention that the exceptions referred to in the amendments should be extended or a different meaning given them from that which they had in the original measure.

It follows from what we have said above that the amendments to the Water Improvement Act here in issue did apply to Conservation and Reclamation Districts, and were properly followed in the organization of the District here involved.

The trial court held that, even though it be conceded there was authority in the statutes for the issuance of preliminary notes in districts located wholly within one county, yet this provision of the statute had no application to districts in more than one county organized through the instrumentality of the Board of Water Engineers, as in this case. This was erroneous. In enacting this chapter, the Legislature only amended those sections of Chap. 87, Acts of the Thirty-fifth Legislature, and amendments thereof, relating to the duties of commissioners' courts, and did not amend that subdivision of the Act of 1921 under which petitions were filed for the organization of districts in more than one county with the Board of Water Engineers, and their orders and action thereon. However, Sec. 82 of Chap. 87, as amended by the Act of 1921, declared that districts lying in more than one county should "be governed by and exercise all the rights, privileges, and powers provided by law as pertaining to districts lying within one county." It is obvious from a reading of Chap. 11 that one county districts are authorized to have submitted at the time of their organization the issue of the issuance of notes of the district, and under the provision just above referred to this authority must be read into the law with reference to the organization of districts lying in more than one county.

Prior to the amendment of 1921 making the Board of Water Engineers the agency through which the initial steps were to be taken for the organization of districts lying within more than one county, these districts were created through the agency of the commissioners' courts of the several counties in which the lands of the district were located. Vernon's Sayles' Texas Civ. Stats., 1918 Supp., Arts. 5107-80, 5107-82.

The commissioners' courts of the several counties having jurisdiction over the proceeding were to order and conduct the elec-

tions in largely the same manner that elections were conducted for one county districts, making the commissioners' court of the county in which was located the larger portion of the land of the district the final returning and canvassing body. The details of the authority to be exercised by the commissioners' courts in the creation of districts in more than one county were defined, in the main, in those sections of the law providing for the creation of one county districts. Vernon's Sayles' Civ. Stats., 1918 Supp., Arts. 5107-6, 5107-8, 5107-9, 5107-10.

It is obvious from reading all these Articles of the statute just noted that many provisions contained therein were essential to the performance of the duties required of the commissioners under the provisions of Art. 5107-80 and 5107-82, where their duties as to the creation of a district embracing more than one county were only generally defined.

As we have seen, Articles 5107-80 and 5107-81 were amended in 1921, and the duties therein previously prescribed for the commissioners' court of the several counties, when a district lay in more than one county, were devolved in substance and effect upon the Board of Water Engineers, and the detail duties prescribed in the Articles cited for the county commissioners were just as essential after this change was made as before, and we have no doubt are just as applicable as before.

A reading of the various Articles shows plainly that both before and after the Board of Water Engineers was designated as an agency for the organization of districts having lands in more than one county, it was necessary to go back to those Articles of the statute originally written to govern the creation of districts located within a single county, and to there find the detail of the duties of the county commissioners courts with reference to ordering the election, notices of election, conduct of election, and canvass and returns of the election. In other words, Arts. 5107-6, 5107-7, 5107-8, and 5107-9 were integral parts of the law of the creation of districts, whether located in one county or more than one county, and whether the agency for their creation was the commissioners court of merely one county or the commissioners courts of more than one county, or the Board of Water Engineers, as the case might be. This was the law in 1923, when the Legislature amended Secs. 5, 7, and 9 of Chap. 87, Acts of the Thirty-fifth Legislature, as previously amended. That is, the Legislature amended what we have designated as Arts. 5107-5, 5107-6, 5107-7, and 5107-8.

The amendment to Art. 5107-7 relates to the manner of conducting elections. This provides they shall be conducted and

be governed by the general election laws, except as otherwise provided. It states the qualifications of those who are entitled to vote. It provides for the creation of election precincts within the territory voting on the creation of a district, for the appointment of judges and clerks for each polling place, and the designation of one of the judges as a presiding judge. It requires the commissioners' court to print a certain number of ballots for the election, and then says: "Said ballots for said election shall have printed thereon substantially the following: 'For Water Improvement District' and 'Against Water Improvement District,' *'For issuance of notes of said district,' 'Against issuance of notes of said district.'* "

Art. 5107-9 as amended relates to returns and canvass of the votes, including the vote on the issuance of preliminary notes.

It will be seen by reading these two amended articles that it is the duty of the commissioners' court to place upon the ballots the question as to the issuance of the notes, and to declare the result with reference thereto.

In Art. 5107-9 as amended, which is embraced in Sec. 3 of Chap. 11 Acts of 1923, it will be noted that in the event the district was composed of territory lying in two or more counties, the returns should be canvassed and the result declared "as hereinafter provided," showing clearly that this section was intended to apply to districts composed of more than one county, except that the result should be declared as provided in those sections of the general law of which this was an amendment, and to which we have previously referred, which made the county judge of one of the counties the canvassing board and returning officer to declare the results of the election. But as to the substance of the election and the things to be voted upon, there was no change. These were to be the same as if the election was in a district located in one county.

On the whole, we therefore conclude that while the statutes are more or less indefinite and somewhat confusing, what the Legislature really intended to do was to authorize districts in more than one county to be organized with the same power and authority and in the same manner with the exception noted, as districts located in one county, and that the question as to whether or not the district attempted to be organized in the instant case should have power to issue the organization notes was a proper one to be submitted to the voters, and was submitted in accordance with the law.

The trial court, however, found that even though there was a statute for the issuance of the preliminary notes (with which

contention however he did not agree), still the issuance of the notes was in violation of the Conservation Amendment to the Constitution. With this conclusion we cannot agree. The language of Sub. C, Sec. 59, Art. 16 of the Constitution is clearly broad enough to include notes as a form of "indebtedness," and their issuance was submitted to the voters in compliance with the constitutional mandate.

It is true the creation of the district had not been fully consumated, but it had reached the point where the boundaries of the district were defined and where the qualified property tax paying voters could express themselves upon this proposition at the polls; and that in our opinion is the substance of the constitutional provision.

The method of submitting the question of the issuance of bonds by a local Improvement District at the same time that its creation is submitted, was a familiar one at the time of the passage of the Act of 1923 here under review, and so far as we know, has never been questioned before. Revised Stats. 1911, Arts. 2578 to 2583. Vernon's Complete Texas Stats. (1920), Arts. 2578 to 2582.

We see no reason, and have been cited no authority, for holding this law unconstitutional on the grounds urged. The rule is that unless an Act is clearly unconstitutional, we must hold it valid, and we hold Chap. 11, Acts 1923, in so far as here involved, valid and constitutional. H. & T. C. Ry. Co. v. Harry & Bros., 63 Texas, 257, 261; Brown v. Galveston, 97 Texas, 9; Koy v. Schneider, 110 Texas, 369.

The trial court was of the opinion that the issuance of the organization notes was unauthorized, for the reason that the ballot did not describe the notes, nor specify the rates of interest. This was erroneous. The statute made no such requirement, but left these suggested matters, aside from the statutory limitation as to the amount of the notes, to the judgment and discretion of the directors of the district.

Before discussing the other constitutional questions raised, we deem it essential that the provisions of the statute attacked be stated and their meaning determined.

The first step in the proceeding is a petition to be signed by the owners of title of a majority of the acreage of the proposed district, or by fifty property tax paying voters, and presented to the Board of Water Engineers "for a hearing to determine the advisability of the creation of such district and for an order of election creating such district and for the election of directors of the district." Upon the filing of the petition the

Board of Water Engineers are required to set it down for hearing at a specified date, and cause notice to be given the commissioners' courts of each county in which the land is located, stating the time and place of hearing. Upon receipt of this notice it becomes the duty of these courts, or the duty of their respective clerks, to post notices at the doors of the court houses of their several counties of the date and place of the hearing. At such hearing *"any person whose lands would be affected by the organization of such district may appear before the Board of Water Engineers and protest against or contend for the creation of the proposed district, and may offer competent testimony to show that said district would or would not serve a beneficial purpose, and that the organization of such district would or would not be practicable or capable of accomplishing the purposes intended by its organization."* (Italics ours). If upon hearing it appears to the Board of Water Engineers that the proposed plan of water conservation, irrigation, and use presented in the petition is practicable and would present a public utility, then they shall so find and enter their findings on the records of the Board, transmit a certified copy thereof to the commissioners' court of each county involved, and name a date on which an election shall be held in the territory to be comprised within the district, to determine whether or not the proposed district shall be created in accordance with the provisions of the Act, and for the election of a Board of five directors. Should the Board, however, upon the hearing determine that the proposed district is not practicable, will not serve a beneficial purpose, and that it would not be possible to accomplish through its organization the purposes proposed, then it shall so find, and enter its findings of record, and dismiss the petition. The law expressly provides "that *the boundary lines of the proposed district may be so changed* in the course of such hearing as to meet objections urged to the practicability and feasibility of the district * * * if such changes will result in bringing the proposed district within the provisions of the statute and would make such district serve a beneficial purpose." (Italics ours). Vernon's Texas Civil Stats., 1922 Supp., Arts. 5107-80, 5107-81. The proceedings subsequent to the foregoing as to the election, etc., have already been adverted to, and may be found in the statutes. If a majority of the votes cast in the district are in favor of its creation, this finding is to be entered of record in the permanent records of the commissioners' court of each county in which any of the land may lie, and the returning officer specified in the statute is required to certify the result to the five persons receiving the

highest number of votes for directors and to issue to them a certificate of election. Afterwards the directors are to proceed with the organization of the district as provided by law. Vernon's Texas Civil Stats., Arts. 5107-81. The Board of Directors are authorized after having qualified to select officers and employes, and proceed with the direction of the affairs of the district in the manner provided in the case of districts wholly within one county. All such districts are declared by the statute to be *governmental agencies, bodies politic and corporate,* and "shall be governed by and exercise all the rights, privileges and powers provided by law as pertaining to districts lying within one county." Vernon's Civ. Stats., 1922 Supp., Art. 5107-82.

It is plain, we think, from the statutes just referred to, that the hearing before the Board of Water Engineers contemplates that they shall determine what the boundaries of the proposed district shall be, and shall by their order define and establish these boundaries; that in doing so they must take into consideration whether or not any or all of the land in the proposed district will be benefited by the creation of the district. It is clear that any person "whose land would be affected by the organization of the district" may appear before the Board and protest against or contend for its creation, and offer testimony to show that the creation of the district would or would not serve a beneficial purpose, or that it would or would not be practicable or capable of accomplishing the purposes intended by its organization. Vernon's Texas Civ. Stats., 1918 Supp., Art. 5107-80. Manifestly this statute must be construed with reference to the Conservation Amendment to the Constitution, and with the general purposes of the water laws of the State, in so far as they touch the subject of irrigation and other uses of water connected with the district here proposed to be organized.

The Conservation Amendment, Sec. 59, Art. 16, declares, among other things, that the irrigation of the arid, semiarid, and other lands of the State needing irrigation, is a public right and duty, and the Legislature is required to pass laws appropriate to this end. Subdivision (b) of the Conservation Amendment states that there may be created within the State or the State may be divided into Conservation and Reclamation Districts, to accomplish the aforenamed purpose, among various others, which districts when created shall be governmental agencies and bodies politic and corporate, with such powers of government and such rights, privileges, and functions concerning the subject matter of the Conservation Amendment as may be conferred by law. It is obvious from the Conservation Amend-

ment that the lands authorized by it to be irrigated, and those which are therefore authorized to be placed within an Irrigation District, are those in the arid or semiarid regions, or which are "other lands needing irrigation." Construing and interpreting the power conferred on the Board of Water Engineers to determine whether the creation of a proposed district is advisable, and whether or not it would serve a beneficial purpose, or is practicable "or capable of accomplishing the purposes intended by its organization" in the light of the Conservation Amendment, the general terms used in the statute must be held to embrace the right to determine whether or not the land of a proposed Irrigation District is arid, semiarid, or for other reasons needs irrigation, or would be benefited by the other constitutional and statutory activities of the district. That this construction is correct is shown by various provisions of the law. For example, Art. 5107-1, Vernon's Texas Civ. Stats., 1922 Supp., in stating in general terms the objects and purposes of Water Improvement Districts, says: "Such districts being authorized to provide for the *irrigation of the land included therein,* and when operating under Sec. 59 of Art. 16 of the Constitution furnish water for domestic, power, and commercial purposes." (Italics ours.) The same Art. states that the districts may be formed by co-operation with the United States under the reclamation laws for the purpose of constructing *irrigation* works, etc.

In the case of districts wholly within one county, where the application and hearing are before the commissioners' court of the county, language similiar to that now under discussion, with reference to the hearing and the right of contest, is used, and the commissioners' courts are expressly authorized to determine whether or not the organization of a proposed district is feasible and practicable, that it is needed, would be a public benefit, *"and a benefit to the lands* included in the district." Vernon's Texas Civ. Stats., 1918 Supp., Arts. 5107-2, 5107-3. The language used with reference to the duties of the commissioners' court in the creation of a one county district, and that with reference to the duties of the Board of Water Engineers where the district lies in more than one county, is not precisely the same, but we think the meaning is the same in each instance. Clearly the purposes of each method of organization is the same, that is, to authorize the creation of a public corporation, each of which is to have and exercise precisely the same power and perform the same functions. This is plainly so for the reason that the statute expressly provides, as to districts in more than one county, "all

such districts shall be governmental agencies and bodies politic and corporate, and be governed by and exercise all the rights, privileges, and powers provided by law as pertaining to districts lying within one county." Vernon's Civ. Stats., 1922 Supp., Art. 5107-82.

These Articles of the statute are not only in *pari materia*, but they are part of one and the same Act, having the same purpose, and must, of course, be construed together in the light of the general object of the law. 25 R. C. L., p. 1013, Sec. 253, p. 1006, Sec. 247, p.1060, Sec. 285. Where the Legislature has provided a system for the government of any subject, it is the duty of the court to effectuate that intention by such a construction as will make the system consistent in all its parts and uniform in its operation. "When the Legislature has clearly laid down the rule for one class of cases it is not readily to be supposed that in its choice of words and phrases, or in the enactment of various provisions in the same Act it has prescribed a different rule for another class of cases within the same reason as the first." 25 R. C. L., p. 1024, Sec. 259. Applying the above rule, it is clear that we ought to say, as we do say, that the general, but comprehensive, language of Art. 5107-80 (Vernon's Supp. 1922) has the same purpose and meaning as Arts. 5107-2, 5107-3 (Vernon's 1918 Supp.), and since the latter expressly authorizes the commissioners' court to determine whether or not the creation of a one county district would be *"a benefit to the lands included in the district,"* the former in the use of the statutory words intended to and did authorize the Board of Water Engineers to determine whether or not the creation of a district through them *"would be a benefit to the lands included in the district."*

Aside from the foregoing, the general meaning of the statutory language conferring power of determination upon the Board of Water Engineers is that only lands capable of being irrigated or benefited are to be embraced within the boundaries of the district as defined by them. Even after the creation of the district, land not capable of irrigation by the system provided may, upon hearing be excluded from the district. Vernon's Texas Civ. Stats., 1922 Supp., Arts. 5107-17, 5107-19, 1918 Supp., Art. 5107-18.

After the creation of the district, adjacent lands capable of being irrigated, may be included therein. Vernon's Texas Civ. Stats., 1918 Supp., Art. 5107-20.

Other statutes show that the law contemplates that lands embraced in the district are to be benefited thereby. Vernon's

Texas Civ. Stats., 1922 Supp., Arts. 5107-24, 5107-108, 5107-122c to 5107-122k.

On the whole, considering the Conservation Amendment and all the statutes involved, we have no doubt that the Legislature by the language employed in Art. 5107-80, Vernon's Texas Civ. Stats., 1922 Supp., authorized the Board of Water Engineers, upon hearing, to determine not only the public aspects of the creation of any proposed Irrigation District, but to determine whether or not the lands embraced therein would or would not be benefited by the creation of the district as proposed, and to exclude therefrom lands which would not be benefited. Embree v. Kansas City Road District, 240 U. S., 242, 246.

So, then, reduced to its final analysis, and stated in most general terms, the statute providing for the creation of districts, the lands of which are in two or more counties, provide: (a) A petition by residents of the proposed district, addressed to the Board of Water Engineers, for a hearing to determine the advisability of the creation of the district; (b) a hearing before the Board, an administrative or executive body, after notice, and a determination by that agency as to whether or not the creation of the district would benefit the lands therein embraced, and other relevant features stated in the statute, with authority on the part of the Board to exclude from the proposed district lands which would not be benefited by its creation, include other lands which would be benefited and define the boundaries of the district (c) finally, a vote by the people within the boundaries defined by the Board of Water Engineers, and upon a majority thereof voting for the district, its final creation by appropriate orders, and by qualification of its directors. This system as thus generally stated, but definitely defined by the statutes to which we have already referred, was held by the trial court to be unconstitutional, and therefore void. The findings of law made by the trial court, stating in detail his reasons for this conclusion may be summarized as follows:

1. That the statutes (Art. 5107-8. Vernon's 1922 Supp.) authorizing the petition to the Board of Water Engineers and action thereon by them in the creation of a Conservation and Reclamation District was a delegation of both legislative and judicial authority to the Board, in violation of Sec. 9, Art. 1, and Sec. 1, Art. 5, of the Constitution.

2. That the statutes are unconstitutional because the Legislature attempted, in the absence of constitutional command, "to authorize the creation of a Conservation and Reclamation District through the process of initiative referendum, in violation

of the constitutional provision of the State of Texas requiring that laws should be enacted by the people through their representatives."

Article 2 of the State Constitution, originating with the Constitution of 1845, and continuing in substance the same language throughout the constitutional history of the State, provides that the powers of government shall be divided into three distinct departments, each confined to a separate body of magistracy, to-wit: Those which are legislative to one; those which are executive to another, and those which are judicial to another. It then declares that no person or collection of persons, being of one of these departments, shall exercise any power properly attached to either of the others, except in the instances expressly provided by the Constitution.

There is nothing in this Article nor in succeeding ones which materially differentiates our Constitution in the respect here involved from those of the other States of the Union. They all provide for the division of the powers of government into three departments, in language similar to our own. 6 Ruling Case Law, p. 144, Sec. 144; Cooley's Constitutional Limitations (8th Ed.) Vol. 1, p. 175. It may therefore be said that the general principles of constitutional law, as declared by the various States of the Union, and by the Supreme Court of the United States, on the subject of delegation of legislative power, are applicable and may be examined in determining the meaning of our own constitutional provisions.

It is likewise true that the interpretation and meaning of the constitutional provisions before us is to be ascertained by reference to the common law as declared by the courts of the country, in the light of other specific constitutional provisions and by the usual rules of interpretation and construction. Cooley's Constitutional Limitations (8th ed.) Vol. 1, p. 133; 6 Ruling Case Law, p. 53, Sec. 48, also Secs. 39 to 49; Revised Stats. (1925) Art. 1.

As Justice Ruffin said in Caldwell v. Justices, etc., 4 Jones (N. Car.) Eq., 323, "When, therefore, the Constitution vests the legislative power in the general assembly, it must be understood to mean that power as had been exercised by our forefathers before and after their migration to this continent."

In interpreting and applying provisions similar to our own in various constitutions, in the light of the common law, the courts have found many exceptions to the broad language used, and permitted the delegation of legislative authority for various purposes.

A fair deduction from the authorities seems to be that inher-

ent exclusive powers of general legislation may not be delegated. 6 Ruling Case Law, p. 164, Sec. 165. But there are many powers which the Legislature might exercise, and sometimes does exercise, which may be delegated. For example, it is not a delegation of legislative power, in violation of the Constitution, to grant some designated body powers which the Legislature cannot itself practically and efficiently exercise, such as the making of railroad rates. 6 Ruling Case Law, p. 180, Sec. 180; Stone v. Farmers Loan & Trust Co., 116 U. S., 307; Reagan v. Farmers Loan & Trust Co., 154 U. S., 362; Trustees of Saratoga Spgs. v. Saratoga Gas, etc. Co., 18 L. R. A. (N. S.) 713, and cases in the notes. The Legislature may also delegate the power to make rules to carry into effect complete laws. 6 Ruling Case Law, p. 177, Sec. 178. There are various laws on the statutes of this State illustrative of this principle, among which may be named those authorizing the governor and Sanitary Commission to fix quarantine lines, and authorizing them to promulgate rules and regulations relative to the subject, and the Railway Commission Act. Smith v. State, 168 S. W., 522; Mulkey v. State, 201 S. W., 991; Serres v. Hammond, 214 S. W., 596; G., C. & S. F. Ry. Co. v. State, 120 S. W., 1028.

The power to find facts upon the ascertainment of which a completed law shall be applicable may also be delegated. 6 Ruling Case Law, p. 175, Sec. 175; p. 179, Sec. 179.

The authorities also hold that while the Legislature may not delegate its power to make a law, it may enact a law to become operative upon a certain contingency or future event: As, for example, a vote of the people to be affected thereby. 6 Ruling Case Law, p. 166, Sec. 167.

This rule is not to be understood as applying under all conditions in this State. Ex Parte Farnsworth, 135 S. W., 535; Ex Parte Mitchell, 177 S. W., 953; State v. Swisher, 17 Texas, 441. Generally it applies to matters of local concern. 6 Ruling Case Law, pp. 166 and 167. Under the Constitution of this State there have been delegations of legislative authority concerning matters of local interest. The location of a county seat may be made contingent on a vote of the people. Walker v. Tarrant Co., 20 Texas, 16. The office of public weigher in any subdivision of a county may be abolished by vote of the people at an election ordered upon initiatory petition. Vernon's Anno. Texas Stats., Art. 5686. The case of Stanfield v. State, 83 Texas, 317, illustrates the principle. In that case this Court had before it an Act of 1889, in part reading: "The county commissioners court of any county in this State shall have the power and authority,

when in their judgment such court may deem it advisable, to abolish the office of County Superintendent in said county by an order on the minutes of said court at a regular term." This Court held that this Act was constitutional, and was not a delegation of legislative power, saying:

"It has been said by this court in a general way that laws can only be made by the votes of the representatives of the people in their legislative capacity. The State v. Swisher, 17 Texas, 448.

"There seems to be a well recognized distinction in respect to the question under consideration between laws affecting only the municipal subdivisions of the State and such as affect the State-at-large; and whatever differences of opinion there may be about the application of the rule to the general laws that affect alike the whole State, it seems to be well established that the maxim that the legislative power is not to be delegated is not trenched upon when the legislation merely bestows upon the municipal organizations of the State certain powers of local regulation. Cooley's Constitutional Limitation, Sec. 143; Werner v. City of Galveston, 72 Texas, 22.

"Our Constitution and statutes each provide for the adoption of laws in particular localities according to and dependent upon the expressed will of the people to be affected, and such statutes have not in every instance been expressly directed by the Constitution. It would be tedious and would serve no useful purpose to undertake here to enumerate all instances of such legislation.

\*   \*   \*   \*   \*   \*

"It was the Legislature, and not the County Commissioners' Court, that made the law giving to the court the power to abolish the office. The court abolished the office in pursuance of a law of the Legislature, but it can not be said that because it exercised that power under the law it made the law itself." 83 Texas, 231.

A very general and common instance of the delegation of legislative power is that found in the enactments generally throughout the country, by which the voters of a certain territory are authorized to incorporate into a town, city, or municipality.

This principle of local self-government, fought out through the centuries in England by its cities and municipalities, became a dominant characteristic of our colonial and state governments, finding expression in many ways, and in reference to almost every type of governmental agency endowed with local duties or for the purpose of making local improvements. Cooley's Con-

stitutional Limitation (8th Ed.), Vol. 1, p. 236; Dillon on Municipal Corporations (5th Ed.), Vol. 2, Secs. 14, 15.

In England itself the method of creating municipalities by initiatory petition and vote of the people was not confined to towns and cities proper, but was extended to drainage districts similar in character to our Conservation and Reclamation Districts. Coulson & Forbes Laws of Waters (England), Chap. 10, pp. 642 to 663. In the United States this principle and method of creating municipal corporations has not only been followed, as stated, but has been applied to Irrigation and Drainage Districts. Long on Irrigation, Sec. 298; 19 Corpus Juris, pp. 614, 617, 625, 636, 637; 24 Ruling Case Law, pp. 562, 566, 568; Elliott on Roads and Streets (4th Ed.), Vol. 1, Secs. 513, 514, 517, 522, Sec. 512 (note 22).

In this State the method of creating cities and towns and extending their boundaries by petition and vote has been followed from the outset, and has always been sustained as being within the Constitution. Paschal's Anno. Digest, Arts. 5247 to 5277; Gammel's Laws, Vol. 4, pp. 941, 999; Rev. Stats. 1879, Arts. 506 to 541; Vernon's Ann. Stats. (1925), Art. 1133 *et seq.*, Arts. 964 *et seq.*, Art. 974; Werner v. Galveston, 72 Texas, 22, 27; Graham v. City of Greenville, 67 Texas, 62; Trent v. Randolph, 130 S. W., 737.

The course of legislation in Texas as to other municipalities or quasi municipalities has been the same as that in other States, and we have had statutes for many years under which school, road, drainage, and flood control districts have been created, wholly or in part, by local authorities, and frequently by initiatory petition and vote of the people. R. S. Arts. 726 to 746, 2741, 2743, 2757, 2769, 2785, 2803, 2806; General Laws 1895, Chap. 97; General Laws 25th Leg., Chap. 63; Sayles' Texas Civ. Stats., 1897, Art. 4817a to 4817w; General Laws 1897, Chap. 77; General Laws 1899, Chap. 64; General Laws 29th Leg. (1905), Chap. 110; Vernon's Complete Texas Stats. 1920, Title 47, Chap. 1; also Arts. 5530 to 5534, 5584½ to 5584½bbb. See also existing statutes relating to the creation of Levee and Drainage Districts shown in Chaps. 6 and 7, Title 128, Rev. Stats. 1925.

The history of Irrigation Districts in the United States and in this State has been similar to that of other types of districts referred to. Aside from the embryo law of Texas concerning irrigation passed in 1852, and the Utah Act of 1865, the first real Irrigation District Act in the United States was the California law, known as the Wright Act, passed in 1887. Other States followed at various dates with similar laws: Colo-

rado in 1901; Idaho in 1907; Kansas in 1891; Montana in 1907; Nebraska in 1895; Nevada in 1891; New Mexico in 1909; Oregon in 1895; South Dakota in 1891; Washington in 1890; Wyoming in 1907. Kinney on Irrigation, Vol. 3, Secs. 1391 to 1403. So, when we reach the vital date in the history of irrigation in this State, to-wit: 1904, we find that Irrigation Districts organized for co-operative purposes under State laws were generally known throughout the arid region of the United States. We may assume, also, that the system of irrigation, practiced in this State from 1852 to 1904, was generally well understood, the defects appreciated, and a remedy for these defects, such as they were, desired.

In that year, 1904, a constitutional amendment was adopted, which became Sec. 52, Art. 3, in which in general terms it was provided that "under legislative provision" any county, political subdivision of a county, any number of adjoining counties, or any political subdivision of the State, or any defined district, might upon a vote of two-thirds of the tax payers issue bonds for prevention of overflows, for irrigation, drainage, navigation, and the construction of roads and turnpikes. This was a very general provision, but under it Irrigation, Levee, and Drainage District statutes were enacted from time to time, which authorized the creation of such districts through the agency of local authorities and by vote of the people, all upon initiatory petitions.

In addition to the statutes previously cited, we refer to Rev. Stats. 1911, Arts. 5012 to 5107; Vernon's Texas Civ. Stats. (1914), Art. 5107, Sub. 1, to Art. 5107, Sub. 105; Vernon's Texas Civ. Stats., 1918 Supp., Arts. 5107 et seq.

The action here stated, with reference to the statutes authorizing the creation of these several districts, not only conformed to current legislation throughout the country, but shows of course the legislative construction upon the general grant of power in the constitutional provision just referred to, and is plainly consistent with previous legislative action in this State and the decisions of its courts, and definitely in harmony with the common law, as we have stated it. When the Legislature submitted the Conservation Amendment, it knew, and the people in adopting it likewise knew, the construction which had been placed on similar general language authorizing the creation of cities, towns, and villages, municipal corporations for administering local government, and of similar general language contained in Sec. 52, Art. 3, in regard to the creation of Road, Drainage, Levee, Improvement and Irrigation Districts, public or quasi-

municipal corporations, engaged in the same business as those to be authorized by the Conservation Amendment. And the people having all this in mind, and having in mind the general principles deducible from the common law, that the creation of local improvement districts and administration of local affairs were matters for the people of the localities to be affected, adopted the Conservation and Reclamation Amendment to the Constitution. And we have no doubt that the people in adopting that amendment understood that such local Improvement Districts could be created in such manner as might be prescribed by the Legislature, including the referendum method, through the agency of commissioners' courts and the State Board of Water Engineers, as provided by the laws before us.

We think, from a plain interpretation of our own constitutional provisions, in the light of the history of the subject of municipal legislation in this country, in England, and in this State, that the statutes here attacked do not involve the delegation of either legislative or judicial power in violation of the Constitution, but that in this respect they are entirely consistent therewith. This conclusion is consistent with the general line of authorities throughout the country. Fallbrook Irrigation District v. Bradley, 164 U. S., 112; Embree v. Kansas City Road District, 240 U. S., 242; Long on Irrigation, Sec. 297, and many authorities cited in Note 4; Wiel on Water Rights (3d Ed.), Vol. 2, Secs. 1356, 1357; Farnham on Water Rights, Vol. 3, Sec. 617; Kinney on Irrigation (2d Ed.), Vol. 3, Secs. 1405, 1406, 1407.

Some of the authorities have placed their reasons for sustaining such Acts upon one principle, and some upon another. Our own conclusion about the matter is that, in view of the history of the creation of municipal corporations, and the application of the principle of local self-government, which that history so well illustrates, the apparently all-inclusive language of the Constitution prohibiting the exercises of legislative power except by the Legislature, must be interpreted in the light of the common law, and that it therefore does not include any prohibition against the delegation of power to administrative agencies, and of the people to organize public corporations for the administration of local affairs and bring about local improvements, in the manner provided by our statutes under review. We are convinced this is the sound basis of the rule invariably followed, regardless of the contrariety of reasons given.

Again, there is strong support for our conclusion in the proposition previously stated, that it is not a delegation of legisla-

tive power in violation of the Constitution to grant to some designated body powers which the Legislature cannot itself practically and efficiently exercise. Authorities supra. In other words, that the exercise of that particular type of authority is read as an exception into the general language of limitation of the Constitution. It is merely tantamount to saying that the Constitution itself does not require the impracticable or the impossible. The case of Kinney v. Zimpleman, 36 Texas, 554, states the principle. In that case this Court had before it the question, among others, whether or not the Legislature could constitutionally confer upon the Board of Education authority to district the State for educational purposes, the Act in this respect reading: "The Board of Education shall upon the passage of this Act proceed to apportion anew the territory of this State into convenient educational districts, not to exceed twelve in number:" * * * It was urged against this provision that it involved a delegation of legislative power to executive officers. The objection was held untenable, and the Act sustained, this Court, through Mr. Justice Walker, saying:

"That the Legislature may delegate the power, or that they may employ other agencies or persons, to district the State for educational purposes, we entertain no doubt. The maxim *delegata protestas non potest delegare* (delegated authority cannot be delegated), does not apply here.

"The Legislature enacts laws to be administered by the judicial, executive, and ministerial officers; and in so far they delegate their power to these officers—a power directly derived through them from the people, and more conveniently exercised than it could be by the Legislature itself, immediately. Indeed, it would be impracticable in many instances, without these mediate agencies, for the Legislature to carry out the objects and purposes of the law. In some cases it would be impossible, and we here employ the Maxim Lex non cogit ad impossibilia (The Law does not compel the impossible). These principles are familiar to the theory and practical working of every constitutional form of government."

However, regardless of the reasons for the rule, and however courts may differ as to the soundness of these reasons, the question that districts of the character here involved may be created by initiative and referendum, through the agency of administrative authorities, has been set at rest by the authorities.

The constitutional questions here involved, in their subordinate and major premises, were all before the Supreme Court of the United States in the celebrated and controlling case of Fallbrook

Irrigation District v. Bradley, 164 U. S., 112. The case involved the constitutionality of California Irrigation District Law, known as the Wright Act, similar in every material respect to our law involved in the case before us. For a full statement of the terms of the Wright Act, and matters relevant thereto, see 164 U. S., pp. 112 to 122. In a lengthy and elaborate opinion the Supreme Court held the Act valid, and among other things said:

"An objection is also urged that it is delegating to others a legislative right, that of the incorporating of public corporations, inasmuch as the Act vests in the supervisors and the people the right to say whether such a corporation shall be created, and it is said that the legislature cannot so delegate its power, and that any act performed by such a corporation by means of which the property of the citizen is taken from him, either by the right of eminent domain or by assessment, results in taking such property without due process of law.

"We do not think there is any validity to the argument. The legislature delegates no power. It enacts conditions upon the performance of which the corporation shall be regarded as organized with the powers mentioned and described in the act.

"After careful scrutiny of the objections to this act we are compelled to the conclusion that no one of such objections is well taken."

To the same effect is the later case of Embree v. Kansas City Road District, 240 U. S., 242. The conclusion here reached is not in conflict with the recent case of Browning v. Hooper, 269 U. S., 396. On the contrary, that case recognizes the principle upon which the validity of the Act before us is sustained as sound. The case plainly supports our conclusion.

So, upon reason and authority, we conclude that the statutes here discussed do not involve any unconstitutional or invalid delegation of legislative or judicial power, and that the courts below were in error in so holding.

The conclusion of the trial court that the vote of the incorporated town of Ballinger could not be excluded in counting the votes in the District was error. The statute expressly provides that such a municipality could or not be included in the District, and if the vote of the municipality is against its inclusion, then it is to be excluded; and the vote of Ballinger was rightly excluded in this instance. Vernon's Sayles' Stats., 1918 Supp., Art. 5107-1; 1922 Supp., Art. 5107-118.

The trial court found as a fact that the boundaries of the District did not enclose a defined area, and were too indefinite.

We have carefully read the evidence in this case and examined

the exhibits. The record not only raises the issue thus found by the trial court, but amply supports his conclusions. A complete statement of the evidence is not practicable in this opinion. We will, however, direct attention to some features of the testimony.

The boundaries of the District are described in the order of the Board of Water Engineers, and other instruments in evidence. That portion of the order giving the boundaries begins by stating in a general way the nature of the description which is to follow. It reads as follows:

"The boundaries of said proposed District are as follows:

"The boundaries of said District are hereinafter fixed and described by a boundary line on the North side of the Colorado River and a boundary line on the South side of said river, each of said boundaries having a beginning point in Coke County, near the site of a proposed dam on said river, and each of said boundaries running in a general Southeasterly direction on each side of said river, and converging at a common point on said river, southwest of the town of Ballinger, as shown by the field notes."

The field notes first locate the beginning point of the north boundary line of the District, and then by many calls down stream on the north side of the river to the point of convergence between the north and south lines. The beginning of the field notes on the north side of the Colorado River reads as follows:

"The boundary line on the north side of the Colorado River is as follows:

"Beginning at a point 1000 feet south of the Southwest corner of Section 458, marked with a flag in mesquite tree on top of South end of ridge, thence one mile in southeasterly direction to northwest corner of Survey No. 767 ½ ;" * * *

Here follow many calls along the north boundary line. The field notes of the north boundary line close with the last call as follows: "Thence along east boundary of Section 503 to southeast corner of Sec. 503; this point common to south boundary of district line."

The field notes of the south line of the District begin as follows:

"Beginning at a point on top of North end of ridge, made with copper nail in stump over which is a flag on staff, 500 feet south of the junction of Buffalo Creek with Colorado River; 2½ miles southeasterly direction along axis of dam from initial point of north boundary; thence East 2000 feet a stone mound;" * * *

Then follow many calls along the south boundary line, the

1927]     TRIMMIER V. CARLTON.     599

last of which is as follows: "Thence east along south boundary Survey No. 503 to southeast corner of Survey No. 503, this corner common to north boundary."

It is obvious from reading those portions of the field notes just quoted, as well as the whole thereof, that they merely call for a beginning point on the north side of the river, and then run in a southerly direction on the north side of the river to a point at the east or southeastern end of the district; that they then begin at a point on the south side of the river two and one-half miles from the initial or beginning point, and run southerly along the south side of the river to the convergent point previously mentioned, and that there is plainly a gap of at least two and one-half miles between the north and south beginning points, which never closes.

The phrase "two and one-half miles southeasterly direction along axis of dam from initial point of north boundary," is clearly descriptive of the beginning point for the south boundary, and is not a call for the beginning point of the north boundary, which we have quoted above. This is necessarily so in order that the field notes may at all be intelligible. If we accept the contention that the phrase quoted is a call for the beginning point of the north boundary, then the next and succeeding calls in the field notes are inapplicable, and practically meaningless. The first call after the phrase quoted is: "Thence east 2000 feet a stone mound." Then follow other calls, as follows: "Thence south 2000 feet to the southwest corner of Survey 456; thence northwest 5000 feet to a stone mound;" and so on. It is obvious from reading the field notes and an examination of the map that these last calls and those following them in the description could not be made to apply, if these calls are to be regarded as being from the beginning point of the north boundary which we would be compelled to do if we regarded the "axis of the dam" call as a field note call instead of a location call of the south beginning point. From an examination of the field notes, we think the conclusion inescapable that the field notes do not close, and that the trial court's conclusion from an interpretation of the field notes alone was as to this point correct. However, when we examine the evidence of the surveyors and engineers, the matter is not clarified, but becomes, if possible, still more confusing.

Mr. C. C. Holder, a civil engineer, who testified for Trimmier and others, and who prepared the field notes and made the map in evidence, stated in his direct examination that he considered that his field notes closed. He predicated this conclusion on the call in the field notes just discussed, which is untenable. His

general statement as to the method used by him in defining the District is consistent with our construction of the field notes. As to this he said:

"I could not say whether my field notes anywhere say to the place of beginning, that they have that expression, 'to the place of beginning,' in them anywhere. My general method in defining this district was to take first a north beginning point and run the north boundary line from the west end of the district, and then go back to the west end of the district and go south to the boundary line and proceed with the south boundary line—that was my plan."

J. E. Powell, who was county surveyor of Runnels County, and had been for about twenty years, testified in the case for Carlton and others. This witness was familiar with all or most of the land embraced in the district, having surveyed most of the land in the disputed area at some time. He had also made a great many maps to be used in connection with the establishment of Taxation Districts. He had read and studied the field notes of the Improvement District in controversy. He stated that these field notes do not give the surveys any name, and that in the territory that is included in the District there are surveys of the same number located in different parts of the proposed territory.

He further testified: That the survey of the district is not a closed survey; that it begins at two different points, to-wit: The beginning point of the north boundary line north of the Colorado River, and the beginning of the south boundary line, a point about two and a half or three miles distant therefrom south of the Colorado River, the two beginning points being on the west end of the district, and the said boundary lines respectively proceeding therefrom in a southeasterly direction until they converge at the eastern end of the district. His concluding statement upon this point is that according to the field notes there is a space of about three miles that is not closed.

The following is a part of the field notes of the south boundary, beginning at the northeast corner of the town limits of Tennyson:

"Thence in a westerly direction to northwest corner of town limits; thence in a southerly direction along west boundary of the town of Tennyson to southwest corner of same; thence south to southeast corner of W. P. Bird's property; thence east, intersecting west property line of K. C., M. & O. Ry.; thence southwesterly direction to west boundary of survey No. 5; thence south to southwest corner of survey No. 5; thence easterly direc-

tion along north boundary of surveys Nos. 114 and 117; thence in northeasterly direction to northeast corner of survey No. 629; thence easterly direction along south boundary of surveys Nos. 20 and 21 to Coke and Runnels Counties line."

The witness Powell pointed out the uncertainty of the foregoing portion of the field notes, as well as of the field notes generally; the witness saying, among other things, that it is not stated in the field notes by the call how far to proceed along the north boundary line of surveys Nos. 114 and 117 in an easterly direction before the call for proceeding in a northeasterly direction to the northeast corner of survey No. 629. The witness further states that Survey No. 5 called for in the field notes is not there; also that there are no Surveys Nos. 20 and 21 in that vicinity; that Survey No. 20, with reference to Survey No. 629, is located about two and a half miles north thereof, and Survey No. 21 is located about three and a half miles north thereof; that no surveys numbered 20 and 21 lie in an easterly direction from the northeast corner of No. 629. With reference to another call in the field notes for an intersection with the property line "of B. A. Taylor Survey No. 1363," the witness testified that there was no Survey No. 1363 in Coke County or that neighborhood.

T. E. Puett, who lived in Coke County, and had been county surveyor of that county for about ten years, in part testified:

"As to whether on the map which counsel has, which purports to be a map of Coke-Runnels Water Improvement District No. 1 —whether I can look upon that map and point out where Survey No. 629 of Coke County is: Well I don't know—629 might be in two or three different surveys. I could not from Survey 629 and that description alone locate myself in Coke County; if a person just called on me to locate Survey 629, I would not, there might be other surveys in the County of that number. If to be a little more specific you said lying along the south of the Colorado River in the vicinity of what is known as the E. Gallion Survey—I know where that is. (Witness indicating on map): Here is the E. Gallion Survey. 629 is not in the E. Gallion Survey—it corners with the southeast corner of it. I am personally familiar with most of those surveys on the ground. I have surveyed there at that place. With respect to Survey No. 629, surveys Nos. 20 and 21 is away north of there—two or two and one-half miles something like that approximately. I think 21 might be three and one-half miles. From my own personal knowledge as a former surveyor of Coke County there is no Surveys 20 and 21 that touch Survey No. 629."

We think the evidence referred to sufficient to show that the

issues found by the trial court in his findings of fact were raised by the testimony; and we, of course, have no authority to disturb the trial court's findings on issues thus raised by the evidence.

The boundaries of a District need not be surveyed until after its creation. (Vernon's Sayles' Texas Stats., 1918 Supp., Art. 5107-16.) But they must be stated in the election order and order establishing the District in a manner sufficient to notify land owners that their lands are included therein, and inform the County Commissioners in what territory elections to create the District are to be held. 19 Corpus Juris, p. 642; Baker v. Harris Co. D. Dist. No. 2, 148 S. W., 351; Vernon's Texas Stats., 1918 Supp., Art. 5107-10; and other statutes cited in this opinion. The boundaries as defined in this case plainly did not do this.

While the trial court and Court of Civil Appeals erroneously construed the law, and erroneously held the statutes here discussed invalid, still, because of the findings of fact stated above, their judgments must be affirmed, and it is so ordered.