**SWEENY HOSPITAL DISTRICT, Relator,**

v.

**Waggoner CARR, Attorney General of Texas, Respondent.**

No. A–9845.

Supreme Court of Texas.

April 22, 1964.

Vinson, Elkins, Weems & Searls, William E. Stapp, Houston, for relator.

Waggoner Carr, Atty. Gen., Austin, Howard W. Mays, Asst. Atty. Gen., for respondent.

CALVERT, Chief Justice.

Relator, the Sweeny Hospital District, seeks a writ of mandamus requiring the Attorney General to approve certain construction and improvement bonds which the dis-

trict proposes to issue under authority of Article 4494q-13.[1] The writ is conditionally granted.

By an election held in the district on June 22, 1963, the majority of those voting voted for two separate propositions. The first proposition submitted creation of the Sweeny Hospital District with authority to levy annual taxes not to exceed seventy-five cents on the one hundred dollar valuation of all taxable property within the district, and the second proposition submitted authority for the Board of Directors to issue the bonds in question here. The Attorney General refuses to approve the bonds which the district proposes to issue for two reasons only, both of which relate to deficiencies in the authorizing statute.

Sec. 6 of Article 4494q–13 provides that no bonds shall be issued by the Sweeny Hospital District "until authorized by a majority vote of *the legally qualified property taxpaying electors*"[2] residing in the district and voting at the election. The first reason given by the Attorney General for refusing to approve the bonds is that the emphasized language permits authorization of bonds by an unconstitutional class of voters in that it does not require that the electors shall have "duly rendered" their property for taxation. In connection with the objection the Attorney General points out that by the order and notice of election, which traced the wording of the statute and are in the bond transcript, the proposed bond issue was submitted to voters who were constitutionally ineligible to vote. A brief review of the history of constitutional provisions and judicial decisions relating to the levy of taxes, expenditure of funds, creation of indebtedness and issuance of bonds by municipal corporations and other governmental subdivisions will afford a better understanding of the Attorney General's

objection and of our holding with respect thereto.

The descriptive language used in various constitutional provisions designating the classes of voters to which the matters mentioned must be submitted is itself varied.

The Constitution of 1876 required voter authorization of at least three such matters. Sec. 3, Article 6 provided that in all elections in cities and towns "to determine expenditure of money or assumption of debt, only those shall be qualified to vote *who pay taxes on property.*" By Sec. 7, Article 11, counties and cities bordering on the coast of the Gulf of Mexico were authorized to levy taxes and create debts, evidenced by bonds, to construct sea walls, breakwaters, etc., "upon a vote of two thirds of *the taxpayers* therein." Sec. 10, Article 11 provided that citizens of cities and towns having a charter authorizing levy and collection of taxes for the support of a public institution of learning could continue to levy and collect taxes for that purpose if authorized by "two thirds of *the taxpayers* of such city or town."

In 1883, Sec. 3, Article 7 of the Constitution was amended to empower the Legislature to authorize school districts to levy ad valorem taxes, provided the levy was approved by "two-thirds of *the qualified property taxpaying voters* of the district." In 1904, Sec. 52, Article 3 of the Constitution was amended to empower the Legislature to authorize political subdivisions to issue bonds and lend their credit and to levy taxes to meet bond requirements for navigation, irrigation, drainage, and construction and maintenance of roads, "upon a vote of a two thirds majority of *the resident property taxpayers* * * * *who are qualified electors of such district.*" In 1917, Sec. 59, Article 16 of the Constitution was adopted authorizing creation of conservation and reclamation districts with power to incur

---

1. All references to statutes and Articles of the Constitution are to Vernon's Texas Civil Statutes and Vernon's Texas Constitution.

2. Emphasis supplied throughout unless otherwise indicated.

indebtedness and issue bonds, but only after being authorized to do so by *"the qualified property tax-paying voters* of such district."

In 1900, a Court of Civil Appeals had occasion in Hillsman v. Faison, 23 Tex.Civ. App. 398, 57 S.W. 920, no writ, to determine whether certain voters were qualified under the provisions of Sec. 3, Article 7 of the Constitution to vote in a school tax election. The Court held that one owning property subject to taxation in a school district on January 1st met the constitutional eligibility requirement of being a "qualified property taxpaying voter" even though his property had not been assessed for taxes. Accord: Rhomberg v. McLaren, 2 Tex.Civ. App. 391, 21 S.W. 571 (1893), no writ. The holding was approved and followed with respect to qualification of voters in school tax elections in Winters v. Independent School Dist. of Evant, Tex.Civ.App., 208 S.W. 574 (1919), writ dismissed, and Barron v. Matthews, Tex.Civ.App., 29 S.W.2d 451 (1930), no writ.

In 1917, a Court of Civil Appeals was called upon in Kempen v. Bruns, 195 S.W. 643, no writ, to determine the qualifications of certain voters in a municipal bond election under the provisions of Sec. 3, Article 6 of the Constitution making eligible "only those * * * *who pay taxes on property* in said city or incorporated town." Citing Hillsman v. Faison, supra, the Court held that persons were qualified voters under the provision if they owned property subject to taxation on January 1st even though their property did not appear on the assessment rolls and they had not paid taxes.

This series of cases led to adoption of an amendment to the Constitution in 1932, which amendment now appears as Sec. 3a of Article 6 of the Constitution, and reads as follows:

"When an election is held by any county, or any number of counties, or any political sub-division of the State, or any political sub-division of a county, or any defined district now or hereafter to be described and defined within the State and which may or may not include towns, villages or municipal corporations, or any city, town or village, for the purpose of issuing bonds or otherwise lending credit, or expending money or assuming any debt, *only qualified electors who own taxable property* in the State, county, political sub-division, district, city, town or village where such election is held, *and who have duly rendered the same for taxation,* shall be qualified to vote and all electors shall vote in the election precinct of their residence."

It will be noted that the provisions of Sec. 3a of Article 6 were made applicable not alone to political subdivisions in existence when it was adopted, but as well to districts "hereafter to be described and defined." Thereafter, in 1944, Sec. 9 Article 8 of the Constitution was amended to provide for reallocation of county taxes if approved by "a majority of *the qualified property tax paying voters,"* and for an additional tax for maintenance of public roads if authorized by "a majority of *the qualified property tax paying voters."* The section was rewritten by amendment in 1956, but it still provides for an additional tax for maintenance of public roads if voted by "a majority of *the qualified property tax paying voters."*

Beginning in 1954, the Legislature initiated and the people adopted a series of amendments to Article 9 of the Constitution, authorizing creation of hospital districts with power to levy taxes and issue bonds. Some of the amendments expressly empower the Legislature to authorize the hospital districts to issue bonds and to assume indebtedness upon a favorable vote of electors, and define the class of electors to which the matter shall be submitted; others do not.

The first of the amendments authorizing creation of hospital districts was adopted in 1954, is now shown as Sec. 4, Article 9, and applies to Galveston County and counties having a population in excess of 190,-000. The amendment expressly empowers the Legislature to authorize the creation of

hospital districts in such counties with power to issue bonds for the purchase or construction of hospitals and to levy a tax not to exceed 75¢ on the $100.00 valuation of property. The amendment does not require an authorizing vote of electors on the issuance of bonds or the levy of a tax, but it does provide that *"such district* shall be approved at an election held for that purpose, and that only *qualified, property taxpaying voters* in such county shall vote therein."

Sec. 5, Article 9, authorizing creation of hospital districts in the City of Amarillo, Wichita County and Jefferson County, was adopted as an amendment to the Constitution in 1958. By sub-section (a) of the amendment the Legislature is empowered to authorize the creation of hospital districts with boundaries coincident with those of the City of Amarillo and Wichita County, and to authorize such districts to issue tax bonds and levy a tax not to exceed 75¢ on the $100.00 valuation of property. There is no requirement in the amendment that creation of these districts or the issuance of bonds by them be authorized by a vote of electors, but there is an express provision that "no tax may be levied until approved by a majority vote of the participating resident *qualified property taxpaying voters who have duly rendered their property for taxation."* The Legislature is also empowered by sub-section (c) of the amendment to authorize creation of two hospital districts in Jefferson County with authority to issue bonds for the purchase of sites and construction of hospitals and to levy a tax not to exceed 75¢ on the $100.00 valuation of property to pay principal and interest on the bonds. With respect to these districts the amendment provides: *"The creation of such hospital district* shall not be final until approved at an election by a majority of the resident *property taxpaying voters* voting at said election *who have duly rendered their property for taxation* * * *, nor shall such bonds be issued or such tax be levied* until so approved by *such voters."*

Two amendments, adopted in 1960 and shown as Secs. 6 and 7, Article 9, empowered the Legislature to authorize the creation of hospital districts in Lamar and Hidalgo Counties "having the powers and duties and with the limitations presently provided in Article IX, Section 5(a), of the Constitution of Texas." In the same year an amendment was adopted and is now shown as Sec. 8, Article 9, empowering the Legislature to create a hospital district in County Commissioner's Precinct No. 4 of Comanche County with authority to issue tax bonds for the purpose of purchasing or constructing a hospital and to levy a tax not to exceed 75¢ on the $100.00 valuation of property. An authorizing vote of electors is not required by the amendment for the creation of the district or the issuance of bonds, but no tax may be levied "until approved by a majority vote of the participating resident *qualified property taxpaying voters who have duly rendered their property for taxation."*

In 1962, two amendments to the Constitution were adopted empowering the Legislature to authorize the creation of hospital districts. These amendments are shown as Secs. 9 and 11, Article 9. Sec. 11 empowers the Legislature to authorize the creation of hospital districts in Ochiltree, Castro, Hansford and Hopkins Counties with authority to issue bonds for the purchase or construction of hospitals and to levy a tax not to exceed 75¢ on the $100.00 valuation of property. No authorizing elections are required for creation of the districts or issuance of bonds, but no tax may be levied "until approved by a majority vote of the participating resident *qualified property taxpaying voters who have duly rendered their property for taxation."*

Whereas all of the other hospital district amendments are local in scope, Sec. 9, Article 9 is general in scope. It empowers the Legislature to provide by law "for the creation, establishment, maintenance and operation of hospital districts composed of one or more counties or all or any part of one or more counties with power to issue

bonds" for the purchase, construction, etc. of hospitals and with authority to levy annual taxes at a rate not to exceed 75¢ on the $100.00 valuation of property to meet the district's bond requirements, the indebtedness assumed by it, and maintenance and operating expenses. No authorizing election is required by the amendment for the issuance of bonds or the assumption of indebtedness, but it provides that "such district shall not be created or such tax authorized unless approved by a majority of the *qualified property taxpaying electors* thereof voting at an election called for the purpose."

Our somewhat tedious analysis of the foregoing constitutional provisions relating to authorizing elections for the issuance of bonds and levy of taxes discloses that in neither the provisions antedating the adoption of Sec. 3a, Article 6 in 1932, nor in those added since its adoption, is there a standard classification of qualified electors. If it may safely be said that the Court of Civil Appeals' decisions in Hillsman, Rhomberg, Winters, Barron and Kempen, heretofore noted, eliminated rendition of property for taxation as a qualification for voting on such matters in elections required by constitutional provisions in existence prior to 1932, it also may be said with equal certainty that Sec. 3a, Article 6 has, since its adoption in 1932, made rendition of property a qualification for voting in elections required by such constitutional provisions before a political subdivision may issue bonds, lend its credit, expend money or assume any debt; and, as well, that Section 3a, Article 6 has made rendition of property a qualification for voting in all elections for such purposes when elections are required by constitutional amendments adopted since 1932, or by enabling acts enacted thereunder, unless the amendments themselves expressly provide otherwise.

 Article 4494q–13 of the statutes is an enabling act for the creation of Sweeny Hospital District, enacted under authority granted the Legislature in Sec. 9, Article 9 of the Constitution. As heretofore pointed out, Sec 9., Article 9 does not expressly require an election as a prerequisite to the issuance of bonds, but Article 4494q–13 does. Section 6 of Article 4494q–13 provides:

"No bonds shall be issued by such hospital district (except refunding bonds) until authorized by a majority vote of the *legally qualified property taxpaying electors,* residing in such hospital district, voting at an election called and held for such purpose."

The provisions of Sec. 3a, Article 6 apply "[w]hen an election is held * * *." The crucial question in this case, therefore, is whether the emphasized language in the quoted sentence authorizes submission of the proposition for the issuance of bonds by Sweeny Hospital District to electors who are not qualified to vote thereon because they have not "duly rendered" their property for taxation. We hold that it does not.

The Attorney General argues that "legally qualified property taxpaying electors" means "legally qualified * * * electors" who are "property taxpayers." A "qualified elector," he contends, is an elector who is qualified to vote under Sec. 2, Article 6 of the Constitution, which lists voter qualifications in terms of citizenship, residence, age and payment of poll taxes; and that the inclusion of "property taxpayers" does not bring the statute into conformity with Sec. 3a, Article 6 of the Constitution because that phrase means the same thing as "those * * * who pay taxes on property," which, under the earlier provision in Sec. 3, Article 6, was held not to require that the owner's property be "duly rendered."

The basic premise of this interpretation is that "legally qualified" modifies and refers only to the word "electors" but does not modify "property taxpaying" in the same clause. We cannot agree with this interpretation. Because the phrase "legally qualified" is placed first in the clause, it is only reasonable to conclude that the Legislature intended "legally qualified" to modify

the remainder of the clause, thus limiting the "property taxpaying electors" to those who are *legally qualified* property tax-paying electors." An elector is qualified to vote only if he is qualified under the Constitution. Voter qualifications are not found only in Sec. 2, Article 6 as the Attorney General seems to contend; Section 3a lists additional qualifications for bond elections. A "property taxpaying elector" cannot, therefore, be "legally qualified" to vote in bond elections unless he meets the general qualification requirements of Sec. 2, Article 6, and also the specific qualification requirements in Sec. 3a, Article 6 that he "own taxable property" which has been "duly rendered" for taxation. We conclude that the statute does require that the property owners of the district shall have "duly rendered" their property before they are qualified to vote in the bond election, and therefore that the statute is constitutional. It follows that the election order and notice of election submitted the bond election to the proper class of voters.

Our conclusion does not conflict with our decision in City of Richmond v. Allred, 123 Tex. 365, 71 S.W.2d 233. In that case a proposal for issuance of revenue bonds and expenditure of the proceeds from their sale by the City of Richmond was submitted to "the resident qualified voters of the city." The Attorney General refused to approve the bonds because the order and notice of election did not limit the class of voters to which the proposal was submitted to "qualified electors who owned taxable property in the city and who had rendered the same for taxation" as required by Sec. 3a, Article 6 of the Constitution. We sustained the position of the Attorney General. Moreover, we refused to presume that the election officials interpreted the language of the order and notice to limit those permitted to vote to electors meeting the qualifications prescribed by Sec. 3a, Article 6.

The distinguishing feature between City of Richmond and this case is that here the wording of the order and notice of election, tracing the language of Article 4494q–13,

did, according to our interpretation of that language, limit the class of electors to which the bond proposal was submitted to those qualified electors who owned taxable property in the hospital district and who had duly rendered the same for taxation. We will not presume in this case that election officials permitted those not so qualified to vote on the bond proposal.

█ We are concerned with the meaning of the phrase, "qualified property tax paying electors [voters]" when it is used in the Constitution and in statutes to define a class of voters, and we recognize that our interpretation of the phrase as applied to the facts of this case may cause some confusion in ordering other elections. We have not sought to ferret out the many statutes which use the expression. To avoid, as much as possible, confusion that may result from our holding in this case, and with due deference to the Court of Civil Appeals' decisions heretofore noted, we will interpret the phrase in varying situations as follows: (1) when the phrase is used in the Constitution to define a class of voters in *any kind or type* of election, it will be interpreted to mean those electors who are qualified under Secs. 2 and 3a, Article 6 of the Constitution; (2) when used in a statute to define a class of voters in an election for any of the purposes set out in Sec. 3a, Article 6, it will be interpreted to mean those electors who are qualified under Secs. 2 and 3a, Article 6 of the Constitution, unless the Constitution itself specifies a different class of voters in the particular election; (3) when used in a statute to define a class of voters in elections for purposes other than those set out in Sec. 3a, Article 6, the words, "property tax paying," will, unless otherwise required by the Constitution, be disregarded as violative of Sec. 2, Article 6 (see King v. Carlton Independent School District, 156 Tex. 365, 295 S.W.2d 408), and the phrase will be interpreted to mean those electors who are qualified under Sec. 2, Article 6 of the Constitution. In elections of the type mentioned in (3) orders and notices of

elections should omit the words, "property tax paying."

The second reason given by the Attorney General for his refusal to approve the bonds is that Section 6 of Article 4494q–13 limits the tax levy to "seventy-five cents (75¢) in any one (1) year." Relator contends that other sections of the statute and Sec. 9, Article 9 of the Constitution clearly show that the Legislature actually intended to authorize a tax levy "not to exceed seventy-five cents (75¢) *on the one hundred dollar ($100) valuation of all taxable property within such district.*"

██ The courts of this state have on occasion added words or phrases to statutes when necessary to give effect to legislative intent, provided the intent of the Legislature is clearly disclosed by the remainder of the statute. Halbert v. San Saba Springs Land & Live-Stock Assn., 89 Tex. 230, 34 S.W. 639, 49 L.R.A. 193; Roby v. Hawthorne, Civ.App., 84 S.W.2d 1108, 1109, no writ history; Tone v. City of Denison, Civ.App., 140 S.W. 1189, no writ history; 53 Tex.Jur. 2d 201, Statutes Sec. 138. While it is true that Section 6 of the statute limits the tax levy to seventy-five cents per year, we think it is clear that the omission of "on the one hundred dollar ($100) valuation of all taxable property within the district" occurred through oversight or clerical error. Sec. 9, Article 9 of the Constitution, under which Article 4494q–13 was enacted, authorizes an annual tax not to exceed seventy-five cents on the one hundred dollar valuation of all taxable property within the district. Similarly, Sections 2 and 5 of the statute each contain the same language. Our conclusion is that Section 6 was clearly intended to authorize an annual tax not to exceed "seventy-five cents (75¢) on the one hundred dollar ($100) valuation of all taxable property within the district."

We assume that Respondent will approve the bonds of Sweeny Hospital District and that issuance of a writ of mandamus will be unnecessary.

WALKER, J., dissenting.