

# THE ATTORNEY GENERAL
## OF TEXAS

January 25, 1989

**JIM MATTOX**
**ATTORNEY GENERAL**

Honorable Terral Smith
Chairman
Natural Resources Committee
Texas House of Representatives
P. O. Box 2910
Austin, Texas    78769

Opinion No.  JM-1011

Re: Computation of the outstanding obligations of a metropolitan transit authority when an election unit withdraws from the authority, and related matters (RQ-1559)

Dear Representative Smith:

You have requested our opinion concerning a dispute between the City of Westlake Hills and the Capital Metropolitan Transit Authority (Capitol Metro), an authority created under article 1118x, V.T.C.S. Until early in 1988, the City of Westlake Hills constituted a "unit of election" that, together with others (the principal one of which was the City of Austin), comprised the authority. See V.T.C.S. art. 1118x, § 5(f). On January 16, 1988, pursuant to statutory leave, Westlake Hills withdrew from the authority.

When a unit of election withdraws from an article 1118x metropolitan transit authority, the statute requires a determination of the outstanding obligations of the authority as of the time of withdrawal. See V.T.C.S. art. 1118x, §§ 6F, 6G. Specifically, you ask:

> Should the liquid assets of a Metropolitan Transit Authority be deducted from the amount of bonded indebtedness to determine the amount of debt as required by HB 943[?]

Article 1118x is a complex statute that governs the creation and dissolution of metropolitan rapid transit authorities. It has been judicially construed on very few occasions. See Bryant v. Metropolitan Transit Auth., 722 S.W.2d 738 (Tex. App. - Houston [14th Dist.] 1986, no writ); City of Humble v. Metropolitan Transit Auth., 636 S.W.2d 484 (Tex. App. - Austin 1982, writ ref'd n.r.e.). See also Garcia v. San Antonio Metro. Transit Auth., 469 U.S. 528,

_reh'q denied_, 471 U.S. 1049 (1985); _Rodriguez v. VIA Metro. Transit System_, 802 F.2d 126 (5th Cir. 1986).

The answer to your question is complicated because the statute has two different sections, 6F and 6G, that purport to control the withdrawal of units of election from metropolitan transit authorities and the determination of an authority's obligations at the time. Both the sections were added to article 1118x during the regular session of the 70th Legislature.[1] Acts 1987, 70th Leg., ch. 790, at 2774; Acts 1987, 70th Leg., ch. 804, at 2796. The operative part of section 6G, for our purposes, is composed of subsections 6G(g) and 6G(h). The comparable parts of section 6F are subsections 6F(l) and 6F(m).

A study of the parallel subsections reveals that two of them are exactly alike, word for word. Both subsection 6F(l) and subsection 6G(g) read:

> The withdrawal of a unit of election under this section is subject to the requirements of the federal and state constitutions prohibiting the impairment of contracts. Taxes shall continue to be collected in the unit of election until an amount of taxes equal to

---

1. Another provision of article 1118x purporting to deal with withdrawals, section 6D, is obsolete because it authorizes withdrawals only pursuant to elections held "on any date from April 1, 1980, to September 1, 1980." Both sections 6F and 6G were added to article 1118x during the regular session of the 70th Legislature in 1987, but by different acts, neither of which expressly referred to the other. Section 6F was added as part of a bill (H.B. 943) finally passed on May 22, 1987, that was expressly made effective September 1, 1987. _See_ Acts 1987, 70th Leg., ch. 790, at 2774. The bill (H.B. 2008) containing the other withdrawal provision, section 6G, was finally passed on June 1, 1987. It was passed later than the other bill but became effective August 31, 1987, one day before the other one took effect. _See_ Acts 1987, 70th Leg., ch. 804, at 2796. Both statutory provisions generally speak of "obligations" rather than "debt" and, thus, include obligations not classified as "debt" for purposes of constitutional restrictions regarding the assumption of debt. _Cf._ Tex. Const. art. III, § 49; art. XI, §§ 5, 7; _McNeill v. City of Waco_, 33 S.W. 322 (Tex. 1895).

the total financial obligations of the unit
of election to the authority has been col-
lected. To determine the amount of the total
financial obligations of the unit of elec-
tion, the board shall compute, as of the date
of withdrawal, the total of:

(1) the current obligations of the
authority authorized in the current budget
and contracted for by the authority;

(2) the amount of contractual obligations
outstanding at that time for capital or other
expenditures in the current or subsequent
years, the payment of which has not been made
or provided for from the proceeds of notes,
bonds, or other obligations;

(3) all amounts due and to become due in
the current and subsequent years on all
notes, bonds, or other securities or obliga-
tions for debt issued by the authority and
outstanding;

(4) the amount required by the authority
to be reserved for all years to comply with
financial covenants made with lenders, bond
or note holders, or other creditors or con-
tractors;

(5) any additional amount, which may
include an amount for contingent liabilities,
determined by the board to be the amount
necessary for the full and timely payment of
the current and continuing obligations of the
authority, to avoid a default or impairment
of those obligations; and

(6) any additional amount determined by
the board to be necessary and appropriate to
allocate to the unit of election because of
current and continuing financial obligations
of the authority that relate specifically to
the unit of election. (Emphasis added.)

It is important to realize that the six items of
computation are used to determine the obligation of the
withdrawing unit of election to the authority, and not the
continuing obligation of the withdrawing unit to the credi-
tors of the authority imposed by constitutional "contract"

clauses. The first five items of computation may be of aid in illuminating the continuing financial exposure of both the authority and the withdrawing unit to creditors of the authority, but statutory provisions cannot control constitutional requirements.

That is why the distinction is important. The statutory provisions control the division of _primary_ responsibility between the withdrawing city and the continuing transit authority for the discharge of transit authority obligations existing at the time of the withdrawal, but those provisions do not purport to (and do not) control the actual _liability_ of either the city or the authority for the discharge of such obligations. The liability of all components of the authority is fixed by the contractual terms under which the indebtedness was undertaken at the time, and subsequent _internal_ arrangements by component units for payment do not affect their common obligation to pay constitutionally protected third-parties in full if the transit authority does not do so. Constitutionally-imposed liability protecting the obligation of contracts exists entirely apart from statutory formulas attempting to define it. U.S. Const. art. I, § 10, cl. 1; Tex. Const. art. I, § 16. See _Morris & Cummings v. State ex rel. Gussett_, 62 Tex. 728, 743 (1884); _Burns v. Dilley County Line Indep. School Dist._, 295 S.W. 1091 (Tex. Comm'n App. 1927, judgmt. adopted); Attorney General Opinions JM-605, JM-453 (1986). _Cf._ _Cardenas v. State_, 683 S.W.2d 128 (Tex. App. - San Antonio 1984, no writ).[2]

---

2. Neither subsection 6F(m) nor subsection 6G(h) expressly relieve a withdrawing unit of any part of the unretired contractual obligations of the transit authority in the "obligation of contract" sense. The withdrawing unit will remain liable to authority creditors if the authority defaults -- even after "an amount of taxes equal to the [statutorily defined] total financial obligations of the [withdrawing] unit" has been previously collected from the withdrawn unit. See _City of Austin v. Cahill_, 88 S.W. 542, reh'g denied, 89 S.W. 552 (Tex. 1905). That is particularly the case regarding obligations incurred before sections 6F and 6G were added to the statute. It could be argued that contractual obligations undertaken by the transit authority after sections 6F and 6G were added to the statute incorporated the new statutory provisions so as to limit the claims of those creditors against withdrawing units

(Footnote Continued)

The sixth item of computation is clearly of a different sort than the first five. The first five measure obligations shared alike by all the units of election composing the authority. The sixth concerns an amount to be "allocated" to the withdrawing unit alone.

Although the legislature cannot constitutionally withdraw from creditors of the transit authority their contractual remedies for default (or curtail their security) without substituting something of equal efficacy and value, see City of Aransas Pass v. Keeling, 247 S.W. 818 (Tex. 1923), the legislature can require, as between the public obligors, a balancing of equities and an adjustment of primary responsibility for the discharge of their joint obligations. See Bexar County Hosp. Dist. v. Crosby, 327 S.W.2d 445 (Tex. 1959).

Just as private joint debtors may agree among themselves that one will individually pay their joint obligation for the benefit of both -- without such an agreement affecting the right and opportunity of the creditor to proceed against both debtors if the debt is not satisfied -- the legislature, in adjusting the relationship between the authority and the withdrawing unit, can require that the transit authority will be primarily responsible for satisfying the joint outstanding obligations once the withdrawing unit has contributed a certain amount toward that end. In arriving at the amount which the withdrawing unit must contribute, the legislature may consider both the obligations of the authority that relate specifically to the withdrawing unit and the unencumbered assets available to the authority for use in discharging obligations. Cf. Board of Managers v. Pension Bd., 449 S.W.2d 33 (Tex. 1969); Wheeler v. City of Brownsville, 220 S.W.2d 457 (Tex. 1949) (obligation to pay tax by reason of legislative adjustment of equities). Such an internal adjustment between joint debtors does not affect the rights of creditors. They may still pursue -- against both debtors -- all remedies they had before, so no impairment of the obligation of contract occurs.

---

(Footnote Continued)
accordingly. See Cochran County v. Mann, 172 S.W.2d 689 (Tex. 1943). However, the statute itself makes no such distinction between "obligations." We need not decide this question here.

None of the six items mentions "liquid assets," although the second item speaks of outstanding contractual obligations "the payment of which has not been made or provided for from the proceeds of notes, bonds, or other obligations." This provision requires only that the computation of outstanding contractual obligations be reduced by those funds _committed_ to the payment of those obligations ("_made_ or _provided for_ from the proceeds"). It does not require that unencumbered liquid assets possessed by the authority be deducted from the liability of the withdrawing unit to the authority.[3]

However, the six provisions of subsections 6F(_l_) and 6G(g) set out above establish only the _items_ to be considered in computing the "total financial obligations of the unit of election" to the authority. The _manner_ in which the computations are to be employed is controlled by subsections 6F(m) and 6G(h). Unlike the 6F(_l_) and 6G(g) subsections,

---

3. "Liquid assets" consist of cash, or assets immediately convertible to cash. Black's Law Dictionary, at 838 (5th ed. 1979). Prior to the withdrawal of a unit of election from an authority, creditors of the authority have a call upon the assets of the authority and sources of revenue contractually committed to satisfy their claims. The existence of other assets _not_ so encumbered does not serve to release encumbered assets from any part of the claims against them. The later-discussed provision at issue in section 6G(h) would be constitutionally objectionable if read as an attempt to limit the liability of a withdrawing unit -- so far as authority creditors are concerned -- to an amount less than the total outstanding amount of the financial obligations of the authority. The prohibition against impairing the obligation of contracts is not absolute, but, to avoid constitutional invalidity, a statute that withdraws or substantially diminishes the contractual security of holders of bonds or other obligations issued by public bodies must substantially substitute an equally effective remedy for that taken away. _City of Aransas Pass v. Keeling_, _supra_. The statute makes no attempt to substitute a new source of payment for the value of "unencumbered" liquid assets that might be deducted from the share of "obligations" to be assumed by a withdrawing unit of election. _Cf._ _Dallas County Levee Improvement Dist. No. 6 v. Rugel_, 36 S.W.2d 188 (Tex. Comm'n. App. 1931, judgmt. adopted).

subsections 6F(m) and 6G(h) are not identical, although the match is very good.

Subsections 6F(m) and 6G(h) are each composed of five sentences. The final three sentences of each subsection are exactly the same, and the only difference in the first sentence of each one is the alphabetical designation of the preceding subsection to which it refers. The important difference is in the second sentence. The second sentence of subsection 6F(m) reads:

> The unit of election's total financial obligation is the sum of the first five computations required by Subsection (1) of this section plus the amount allocated directly to the unit of election under the last computation required by Subsection (1) of this section.[4]

Comparison shows that subsection (h) of section 6G is word-for-word the same as subsection (m) of section 6F except in the passages underscored below -- most notably in the second sentence. Subsection 6G(h) reads:

> The unit of election's share of the financial obligations of the authority under the first five computations required by Subsection (g) of this section shall be in the same ratio that the population of the unit of election has to the total population of the authority, according to the most recent and available population data of an agency of the federal government, as determined by the board. The unit of election's total financial obligation is its share of the first five computations required by Subsection (g) of this section plus the amount allocated directly to the unit of election under the last computation required by Subsection (g) of this section

---

4. Although the form is somewhat different, the language of subsections 6F(1) and 6F(m) of article 1118x, V.T.C.S., is the same as that found in subsection 9A(j) of article 1118y, V.T.C.S., which controls the withdrawal of a unit of election from a regional transportation authority. The provision was added to article 1118y in 1985. Acts 1985, 69th Leg., ch. 101, at 541.

> and less the unit of election's share of the
> total amount of the unencumbered assets of
> the authority that consist of cash, cash de-
> posits, certificates of deposit, and bonds,
> stocks, and other negotiable securities. The
> unit of election's share of those assets is
> determined according to population in the
> same manner as provided for determining the
> unit of election's share of the first five
> computations required by Subsection (g). The
> board shall certify to the governing body of
> the unit of election and to the comptroller
> of public accounts the amount of the total
> financial obligation of the unit of election.
> The comptroller of public accounts shall
> continue to collect taxes in the unit of
> election until an aggregate amount equal to
> the total financial obligation of the unit of
> election has been collected and actually paid
> to the authority. After that amount has been
> collected, the comptroller of public accounts
> shall discontinue collecting in the unit of
> election the taxes imposed under this Act.
> (Emphasis added.)

It is readily apparent that subsection 6G(h) expressly requires that certain unencumbered liquid assets be considered in applying the preceding calculations while subsection 6F(m) does not. On the surface, the language of subsection 6G(h) appears to be substantially more generous to withdrawing units than the language of subsection 6F(m), but we have concluded that the express provisions of section 6G(h) are implicitly contained in subsection 6F(m), and that your question should be answered in the subsection 6G(h) context.

That conclusion is important to the resolution of your question because Capital Metro falls under section 6F, not section 6G. Subsection 6G(a) declares that section 6G applies "only" to an authority created before January 1, 1980, with a principal city having a population less than 1,200,000. Austin has a population of less than 1,200,000, but the rapid transit authority at issue was not created before January 1, 1980. See City of Austin Ordinance 83-1013U, October 13, 1983; Capital Metropolitan Transit Authority Resolution No. CMTA-85-0126-10, January 28, 1985. Section 6F(a) states, on the other hand, that section 6F applies "only" to authorities in which the principal city has a population of less than 750,000 and in which the rate of sales and use tax is one percent. Capital Metro meets each such criterion. See Capital Metropolitan Transit

Authority Resolution No. CMTA-84-1119-04, November 19, 1984.[5]

Sections 6F and 6G are parts of the same statute, added at the same session of the legislature. When different sections of a statute are added during the same session by different acts, they are to be read together as if embodied in a single act. Shaddix v. Kendrick, 430 S.W.2d 461 (Tex. 1968); Shults v. State, 696 S.W.2d 126 (Tex. App. - Dallas 1985, writ ref'd n.r.e). The subsection 6F(m) language must be read in context with subsection 6G(h), and if its literal meaning, when read alone, does not comport with the evident underlying purpose of the complete statute, it will not be construed literally. See Short v. W.T. Carter & Brother,

---

5. Because we have concluded that other passages clearly indicate that the legislature intended no difference in the manner in which the obligations of a withdrawing unit are determined, we need not explore all the implications of subsection 6F(c), which reads:

> A unit of election may withdraw from an authority created under this Act only in accordance with this section. An attempt to withdraw from an authority in a manner other than that provided by this section is void. (Emphasis added.)

Section 6F(c) introduces ambiguity because in referring to "an authority created under this Act," it obviously refers to article 1118x in its entirety. (The legislation that amended article 1118x to add section 6F did not itself create or authorize the creation of any rapid transit authorities.) See Acts 1987, 70th Leg., ch. 790, at 2774; 2A N.J. Singer, Sutherland Statutory Construction § 22.35 at 296 (C. Sands 4th ed. 1985) (phrase "this act" in amended section generally refers to whole act). It is equally obvious that transit authorities governed by the section 6G withdrawal provisions were created "under this Act" (i.e., article 1118x, V.T.C.S.). Under the literal language of section 6F(c), units of election comprising section 6G authorities may withdraw only in accordance with section 6F. According to that section, an attempt to do so in any other manner is void. It may be argued, of course, that subsection 6G(a), enacted later than 6F(c), impliedly repealed the indicated portion of 6F(c). See note 1, supra. The conclusion we reach remedies the matter, in any event.

126 S.W.2d 953  (Tex. 1938).    See also State  v. Estate  of Loomis, 553 S.W.2d 166  (Tex. Civ. App.  - Tyler 1977,  writ ref'd).

The primary objective in the interpretation of statutes is to ascertain  the intent  of the legislature  and, to  do that, courts  look to  an act  as  a whole  and not  to  its isolated provisions. Morrison v. Chan, 699 S.W.2d 205 (Tex. 1985).   Once legislative intent is determined from a general view of  the enactment  as a  whole, the  statute should  be construed so as to give effect to the purpose of the  legis-lature.   Citizens Bank  of Bryan v.  First State Bank,  580 S.W.2d 344 (Tex. 1979).  The statute is to be construed with reference to its manifest object,  and if it is  susceptible to one of two constructions --  one of which will carry  out and the  other defeat  the manifest  object  --  it  should receive the construction  that carries  out the  legislative intent.  Id. at 345.   With those  principles in  mind,  we examine the statutory provisions.

Notwithstanding  the  additional  words  in  the  6G(h) subsection,  the  purposes  of  both  subsection  6F(m)  and subsection 6G(h) are apparently  identical, i.e., to deter-mine (using  an  identical  population-ratio  formula)  "the total amount  of the  financial  obligations of ·the  [with-drawing] unit" as  a percentage of  the total financial  ob-ligations of the authority  of which it has  been a part  -- equitably adjusting the financial  responsibility of one  to another.   There are no grounds for supposing, so far as  we can ascertain,  that  the  legislature meant  to  impose  an inequitable adjustment  of financial  responsibilities  upon any participant, or any group of participants, composing any metropolitan transit authority.[6]

---

6.  Section 6F(b)  of article  1118x, V.T.C.S.,  allows the withdrawal  of  any  "unit  of  election,"  including  a "principal city."  Section 6G(c), on the other hand, states: "In addition to any other manner provided by law, a unit  of election other than  a principal city may withdraw from  an authority as provided by  this section." (Emphasis  added.) We do not  believe this  difference is  intended to  justify different treatment  of withdrawing  units. Some  units  of election, i.e., those  participating in authorities  created before January 1, 1980, with  a principal city of less  than 750,000 people and with  a one  percent sales  and use  tax rate, could  fall under  the terms  of both section 6F  and section 6G.

When the second sentence of subsection 6F(m) is read alone, without the advantage of the subsection 6G(h) text for comparison, something is obviously missing; it obviously does not correctly state the true legislative intention because it states that the withdrawing unit's "total financial obligation" is "the sum of [not its share of] the first five computations . . . plus the amount allocated directly to the unit . . . under the last computation." If the second sentence of subsection 6F(m) were applied literally, the withdrawing unit would be responsible to the authority for the entire indebtedness of the authority plus a double liability for any indebtedness relating specifically to the unit.

It seems plain that the legislature intended the "total financial obligations" of a subsection 6F(m) unit of election, for the purpose of adjusting equities, to be its share of the first five computations, as clarified by subsection 6G(h), rather than the total amount owed by the entire authority, as the 6F(m) subsection literally reads. Cf. Sweeny Hosp. Dist. v. Carr, 378 S.W.2d 40 (Tex. 1964). It also seems plain to us that when subsection 6F(m) speaks only of "the amount allocated directly to the unit of election under the last [sixth] computation," its literal language must be expanded if the underlying legislative purpose is to be fully expressed -- a purpose clarified by subsection 6G(h). Additional words are needed. Texas courts will add words or phrases to statutes when it is necessary to effect the legislative intent. See Sweeny Hosp. Dist. v. Carr, supra; Trimmier v. Carlton, 296 S.W. 1070 (Tex. 1927).

In Trimmier v. Carlton, supra, the Texas Supreme Court considered two statutes that were enacted as parts of one act dealing with the creation of conservation and reclamation districts. One statute expressly authorized the consideration of certain factors by a commissioners court authorizing the creation of such a district, but the other, which involved districts authorized by a state agency, did not. The court said:

> The language used with reference to the duties of the commissioners' court in the creation of a one county district, and that with reference to the duties of the board of water engineers where the district lies in more than one county, is not precisely the same, but we think the meaning is the same in each instance. Clearly the purpose of each method of organization is the same -- that

> is, to authorize the creation of a public corporation, each of which is to have and exercise precisely the same power and perform the same functions.
>
> . . . .
>
> These articles of the statute are not only in pari materia, but they are part of one and the same act, having the same purpose, and must, of course, be construed together in the light of the general object of the law. . . . Where the Legislature has provided a system for the government of any subject, it is the duty of the court to effectuate that intention by such a construction as will make the system consistent in all its parts and uniform in its operation. 'When the Legislature has clearly laid down the rule for one class of cases it is not readily to be supposed that in its choice of words and phrases, or in the enactment of various provisions in the same act, it has prescribed a different rule for another class of cases within the same reason as the first.' 25 R.C.L. p. 1024, § 259.
>
> Applying the above rule, it is clear that we ought to say, as we do say, that the general, but comprehensive, language of article 5107--80 (Vernon's Supplement 1922) has the same purpose and meaning as articles 5107--2, 5107--3 (Vernon's 1918 Supplement), and since the latter expressly authorizes the commissioners' courts to determine whether or not the creation of a one county district would be 'a benefit to the lands included in the district,' the former in the use of the statutory words intended to and did authorize the board of water engineers to determine whether or not the creation of a district through them 'would be a benefit to the lands included in the district.'

296 S.W. at 1078.

Here, the sixth item in the computation of the "total financial obligations of the unit of election" is

> any additional amount determined by the board
> to be necessary and <u>appropriate</u> to allocate
> to the unit of election because of current
> and continuing financial obligations of the
> authority that relate specifically to the
> unit of election. (Emphasis added.)

The statutory requirement that the amount determined by the board be <u>appropriate</u>, as well as necessary, is a requirement that any amount allocated to the withdrawing unit be reasonable. <u>See</u> <u>Frost v. Frost</u>, 695 S.W.2d 279 (Tex. App. - San Antonio 1985, no writ) ("appropriate" synonymous with "reasonable"). The explicit terms of subsection 6G(h) are implicit in subsection 6F(m) because the sixth item of computation is designed to adjust the equities of the situation on an appropriate basis -- an adjustment which, to be reasonable and appropriate, must also take into account, as subsection 6G(h) does, assets of the authority <u>already</u> contributed by the unit of election that are available to retire the joint obligations of the two entities. <u>Cf.</u> <u>Hirshfield v. Davis</u>, 43 Tex. 155, 161 (1875); <u>Cass v. State</u>, 61 S.W.2d 500, 504 (Tex. Crim. App. 1933) ("reasonable," "fair," "honest," "impartial," and "equitable" equated).

In our opinion, the express requirement of subsection 6G(h) that there be subtracted from the computation of the "amount of the total financial obligations" of the authority

> the total amount of the unencumbered assets
> of the authority that consist of cash, cash
> deposits, certificates of deposit, and bonds,
> stocks, and other negotiable securities

for purposes of determining the financial obligations for which the withdrawing unit will remain responsible to the authority, merely clarifies, but does not enlarge, the subsection 6F(m) provision. <u>Trimmier v. Carlton</u>, <u>supra</u>.

Inasmuch as the situations of withdrawing units of election under both section 6F and section 6G, and of the authorities, are the same whether the authority is one created before January 1, 1980, or later, and inasmuch as their joint outstanding contractual obligations are based upon identical items of computation without regard to when the authority was created, the equitable considerations in one case are the same as in the other. In our opinion, the explicit language of subsection 6G(h) is implicit in subsection 6F(m).

In keeping with our understanding of the intent of the legislature, we therefore advise that the City of Westlake Hills, upon its withdrawal from the Capitol Metro transit authority, was entitled to a proportional credit for cash and other unencumbered liquid assets (specified by statute) that remained in the hands of Capitol Metro, the credit to be applied against the amount of taxes to be thereafter collected from Westlake Hills for payment to Capitol Metro. Statutory responsibility for the retirement of Capitol Metro obligations existing at the time of the Westlake Hills withdrawal rests with Capitol Metro, but Westlake Hills (in common with all constituent units of the transit authority) remains liable for the total amount of any then-existing, constitutionally protected contractual obligations.

Because of the construction we give the statute, we need not engage in the discussion of equal protection issues, equal and uniform taxation issues, or local or special law issues that a different construction would require. Cf. U.S. Const. amend. XIV, § 1; Tex. Const. art. I, § 3; art. III, § 56; Wheeler v. City of Brownsville, supra; City of Humble v. Metropolitan Transit Auth., supra.

### S U M M A R Y

Upon its withdrawal from the Capitol Metro transit authority, the City of Westlake Hills became entitled to a credit for unencumbered liquid assets held by Capitol Metro, the credit to be applied against the taxes to be collected from the city thereafter for payment to Capitol Metro. In common with the other constitituent units of the transit authority, Westlake Hills remains liable for certain (then-existing) Capitol Metro contractual obligations if Capitol Metro fails to properly discharge them. Constitutional protection of contractual obligations prevents the statute from operating to relieve the withdrawing city of obligations to bondholders.

Very truly yours,

JIM MATTOX
Attorney General of Texas

MARY KELLER
First Assistant Attorney General

LOU MCCREARY
Executive Assistant Attorney General

JUDGE ZOLLIE STEAKLEY
Special Assistant Attorney General

RICK GILPIN
Chairman, Opinion Committee

Prepared by Bruce Youngblood
Assistant Attorney General